Robert B. TURNER, et al.,
Plaintiffs, Appellants,

v.

JOHNSON & JOHNSON, et al.,
Defendants, Appellees.

Robert B. TURNER, et al.,
Plaintiffs, Appellees,

v.

JOHNSON & JOHNSON, et al.,
Defendants, Appellees.

Johnson & Johnson and Charles M.
Hartman, Defendants, Appellants.

Nos. 86–1211, 86–1212.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1986.

Decided Dec. 31, 1986.

Joseph M. Alioto, San Francisco, Cal., and Daniel R. Shulman with whom Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., Alioto & Alioto, San Francisco, Cal., Jerry Cohen, Cohen & Burg, Boston, Mass., and Joseph S. Iandiorio, Waltham, Mass., were on briefs for Robert B. Turner, et al.

Frederick T. Davis with whom Lynn P. Freedman, Howard S. Schrader, New York City, Riemer & Braunstein, Boston, Mass., and Patterson, Belknap, Webb & Tyler, New York City, were on brief for Johnson & Johnson and Charles M. Hartman.

* Of the Fifth Circuit, sitting by designation.

1.  The defendants in this appeal are the company and executive Charles M. Hartman. The jury found for Thomas E. Taylor, and the district

Before COFFIN, Circuit Judge, WISDOM * and ALDRICH, Senior Circuit Judges.

COFFIN, Circuit Judge.

This case arises from defendant Johnson & Johnson's purchase of an electronic thermometer business from plaintiffs. A jury awarded plaintiffs $4 million on their claim of common law fraud arising from the sale, but the district court ruled or found for Johnson & Johnson and several of its executives on all other claims, including one for statutory fraud. Each side appeals the decisions adverse to them. We conclude that defendants are entitled to prevail on all but one aspect of the appeals, and as to this we remand for a new trial.[1]

### I.

The essence of plaintiffs' claim is that they were induced into selling their thermometer business at far below its value by various misrepresentations and omissions made by Johnson & Johnson during the negotiations process. Plaintiffs claim that Johnson & Johnson defrauded them in order to eliminate plaintiffs' thermometer as a competitor to another thermometer in which Johnson & Johnson had an interest. We begin by examining in some detail the facts surrounding the transaction between the two parties.

*Johnson & Johnson Acquires AMEC.*

Plaintiffs are the three principals of American Medical Electronics Corporation (AMEC). Robert Turner, an inventor, founded AMEC in 1971 to manufacture and distribute an electronic thermometer called Meditemp.[2] Gordon Ramsey was AMEC's principal attorney, a corporate director, a shareholder and, at times, an officer. Charles Johnston is an investor who, in 1975, held a majority of AMEC's stock.

court granted a judgment n.o.v. for Gene E. Hollen.

2.  Electronic thermometers provide digital displays of a patient's temperature.

These three men represented AMEC in its negotiations with Johnson & Johnson.

Johnson & Johnson, which sells a variety of disposable products to hospitals and doctors' offices through its patient care division, learned of Meditemp in September 1975 and explored the possibility of acquiring an interest in the product. By that time, AMEC was deeply in debt and unable to pay its bills, although it had a backlog of orders for the Meditemp thermometer. The parties engaged in extensive negotiations from January through June 1976. Their contact included face-to-face meetings, telephone calls, memos, and the exchange of several versions of a contract. A final agreement was signed on June 17, 1976.

The agreement provided plaintiffs with a lump sum cash payment of about $1 million, guaranteed minimum royalties of $300,000 paid out in $75,000 installments, and, if Johnson & Johnson marketed Meditemp, additional royalties on the sale of probe covers used with the thermometer. Johnson & Johnson also had the option, within a certain period of time, of reassigning the original assets to AMEC in lieu of the remaining royalty payments. Section 12.1 of the contract specified that Johnson & Johnson had no obligation to market Meditemp. That section stated, in part:

> J & J ... makes no representation or warranty that it will market a thermometer hereunder, or, if J & J does market a thermometer hereunder or ... that such product will be the exclusive means by which J & J attempts to enter or participate in the temperature-taking field. J & J shall not be obligated to use its best efforts in marketing a thermometer hereunder. All business decisions, including without limitation the design, manufacture, sale, price and promotion of a product or products marketed under this Agreement shall be within the sole discretion of J & J.

Section 12.2 stated that the company was not actively pursuing any other invention in the electronic thermometer field with two exceptions: the patient care division was attempting to develop a disposable probe for electronic thermometers and a subsidiary company was pursuing another electronic thermometer.

Johnson & Johnson began marketing Meditemp in mid–1978. In the fall of 1979, the patient care division decided to withdraw from the sale of Meditemp. Plaintiffs were notified and discussions ensued about the future of the Meditemp business, including whether plaintiffs or a third party would take it over. No agreement was reached, and in August 1980, Johnson & Johnson shut down the Meditemp plant despite demands from plaintiffs that Johnson & Johnson not do anything to interfere with Meditemp as a "going business." Johnson & Johnson assigned the original AMEC patents to plaintiffs, but withheld the physical assets as a setoff against the company's counterclaims in this lawsuit.

*The Survalent Thermometer.*

In 1974, a Johnson & Johnson subsidiary, Arbrook, Inc., had signed an option agreement for another electronic thermometer, called Survalent. Survalent is a large unit that uses a rechargeable battery and functions with a separate recharging unit. It is designed to be worn around the neck on a strap, allowing the numbers to be read easily by an observer. In these respects, Survalent resembles the IVAC thermometer, the leading electronic thermometer on the market. In contrast, Meditemp is a small, hand-held unit. Although Meditemp can be used with a neck strap, the digital display cannot be read by an observer while the unit is hanging around the neck because the display faces forward rather than up. Meditemp uses a disposable battery and has no separate recharging unit.

A similarity between the two thermometers emphasized by plaintiffs is the instruments' ability to allow nurses to monitor pulse rates while taking temperatures. This feature is possible because the digital display counts seconds during the 30–second interval in which the thermometer measures temperature.

Arbrook purchased Survalent in 1977 and began national distribution in January

1979, six months after Johnson & Johnson launched Meditemp. The Survalent project was dropped later in 1979.

*The Patent Interference Proceeding.*

In February 1976, a Johnson & Johnson patent attorney noticed an apparent overlap between one claim of the Meditemp patent and a claim in the Survalent patent application; the overlap related to the pulse-counting feature of the thermometers. At that time, the Meditemp patent had been issued but the Survalent patent was still in application form. The Johnson & Johnson attorney brought the overlap to the attention of Survalent's attorneys, and Survalent's owners subsequently requested a patent interference, an administrative proceeding in which the Patent Office would determine who invented the pulse-counting function first and thus who was entitled to hold a patent on it.

By the time the patent proceeding began, in March 1977, Johnson & Johnson owned both patents. The company hired separate teams of lawyers to litigate each side in the interference. Although the Survalent application had been filed first, the Meditemp patent was awarded priority.

*The Alleged Fraud.*

Although plaintiffs raise a number of alleged fraudulent statements and omissions in their brief to us, we confine our consideration to the four specific statements and the series of nondisclosures on which the case went to the jury.[3] These deceptive practices allegedly took place during negotiations leading up to the contract signing, and on the day of the closing.

These statements and nondisclosures are:

(1) That Johnson & Johnson would "(a) promote the sale of the Meditemp thermometer, (b) offer it to customers, and (c) educate health care professionals on how to use it."

(2) That Johnson & Johnson had no interest in any other thermometer, with the exception of Arbrook's interest in an "IVAC–type" thermometer.

(3) That the Survalent thermometer was an "IVAC–type" thermometer.

(4) That Johnson & Johnson corporate policy prevented it from paying royalties on foreign sales.

(5) That Johnson & Johnson failed to tell plaintiffs that Survalent had a pulse-counting feature, that Survalent infringed part of the Meditemp patent, that Johnson & Johnson intended to "manipulate the outcome of a patent proceeding which it created," and that Johnson & Johnson "intended to suppress Meditemp so that it wouldn't be competition for Survalent."

*Procedural Background.*

Plaintiffs brought suit in federal court in Massachusetts in November 1979, alleging fraud, breach of contract, deceptive practices under Mass.Gen.Laws Ann. ch. 93A, and violation of federal antitrust law. The court dismissed the antitrust claim for lack of standing. A trial was held on the other claims, and the court directed a verdict for defendants on the contract claim at the conclusion of plaintiffs' case. The court, which heard plaintiffs' claim under chapter 93A, also found in favor of defendants on that issue. The jury returned a verdict for plaintiffs on the common law fraud claim, and awarded $4 million in damages. Although the court originally awarded prejudgment interest to plaintiffs, it later vacated that award.

---

**3.** As part of its instructions to the jury on the elements of a cause of action, the district court stated:

"As I understand the alleged misrepresentations, and I interpret them from the complaint, the initial paper which instituted this action, they at least are alleged to be the following."

The court then listed the four alleged misrepresentations and the series of omissions described below. Plaintiffs objected to this instruction, claiming that the evidence showed other misrepresentations upon which the jury could base a finding of fraud. Although plaintiffs list a series of additional misrepresentations in their brief on appeal, they do not appeal the district court's limitation to the four misrepresentations and the series of omissions presented to the jury. We therefore consider the issue of whether the court properly limited the statements as outside the scope of this appeal.

Johnson & Johnson filed a motion for a new trial or judgment n.o.v., the denial of which is the basis of the company's appeal. Plaintiffs separately appeal the district court's rejection of their contract, antitrust, and chapter 93A claims, and the court's refusal to award prejudgment interest. 624 F.Supp. 830 (1985).

## II.

■ We begin our legal analysis with Johnson & Johnson's assertion that the district court erred in denying the company's motion for judgment n.o.v. or new trial on the common law fraud claim. The standard for setting aside a jury verdict is a rigorous one. We may do so only if "the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd-Angier Production Co. v. Omni Publications International*, 756 F.2d 930, 934 (1st Cir.1985). Thus, we must find that no jury could reasonably find that all five elements of common law fraud were met with respect to the alleged misrepresentations and omissions. These elements are: (1) that the statement was knowingly false; (2) that Johnson & Johnson made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision to sign the contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.

We conclude that only Johnson & Johnson's statements and omissions involving the Survalent thermometer could possibly meet the requirements for fraud, and thus were properly before the jury. The verdict must therefore be vacated, and a new trial held, because the jury's finding of fraud may have been based on others of the alleged misstatements or omissions. *Chedd-Angier*, 756 F.2d at 934 (new trial should be granted when " 'material issues were improperly submitted to ... the

jury' "). We now turn to the alleged misrepresentations.

(1) *That the company actively would promote Meditemp.* The company's primary argument is that, as a matter of law, a jury may not find fraud when the alleged misrepresentations directly contradict the specific terms of a subsequently entered written contract between the parties. Johnson & Johnson's theory is that when the written contract refutes the alleged oral misrepresentations, there can be no reasonable reliance on those prior statements. Thus, in this case, because section 12.1 of the contract specifically provided that Johnson & Johnson had no obligation to market Meditemp, plaintiffs could not reasonably rely on an oral promise that the company actively would promote the thermometer.

Plaintiffs counter that the facts of this case fall within the holding of Massachusetts cases establishing that a party may not contract out of fraud. These cases involve the use of general disclaimers or integration clauses, *see, e.g., Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941); *Connelly v. Fellsway*, 270 Mass. 386, 170 N.E. 467 (1930); oral assertions in the face of contractual silence, *see, e.g., Sandler v. Elliott*, 335 Mass. 576, 580, 141 N.E.2d 367, 370 (1957); *New England Foundation Co., Inc. v. Elliott A. Watrous, Inc.*, 306 Mass. 177, 27 N.E.2d 756 (1940), or other ambiguous language that was susceptible to the plaintiff's interpretation establishing fraud, *see, e.g., Kilkus v. Shakman*, 254 Mass. 274, 279, 150 N.E. 186 (1926). *See also V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 418 (1st Cir. 1985) (involving "as is" clause and applying Massachusetts law).

In *Bates*, the leading Massachusetts case on this subject, the Massachusetts Supreme Judicial Court expressly rejected the notion that "a contract must be held sacred regardless of the fraud of one of the parties in procuring it," 308 Mass. at 182, 31 N.E.2d 551, but it also recognized that a balance must be struck between two competing values: contractual certainty and

protecting innocent parties from fraud. The court stated:

> As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud.... The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices. In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. ... To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

*Id.*

We have no doubt that the balance shifts when the party asserting fraud is not seeking to avoid an ambiguous or deceptive "contractual device[ ]," but is trying to *reverse* the precise terms of an agreement. When a contract contains an "as is" clause or other ambiguous language, the agreement is to some extent left undefined, and the plaintiff's understanding of the agreement logically may be colored by the defendant's prior statements, fraudulent or otherwise. Moreover, there is nothing on the face of the contract to trigger alarm. In such a case, barring a fraud claim would, in effect, allow parties to contract out of fraud.

■ In contrast, a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause. Moreover, if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore. Even if a sales contract provided that the product for sale is old, the buyer could claim that she purchased it only because the seller said it was new. Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements. Thus, in weighing the competing interests, the Massachusetts Supreme Judicial Court undoubtedly would find that the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud.[4]

The complication in this case is that the facts fall somewhere in between a flat contradiction and a vague general disclaimer. Section 12.1 of the contract states only that Johnson & Johnson has no obligation to market Meditemp. It does not state that the company plans to shelve the product, which would be the direct contradiction to an alleged promise to actively market Meditemp. Thus, on the one hand, as in the case of an "as is" clause, there is no inherent conflict between the oral promise to promote the product and the written agreement imposing no obligation on Johnson & Johnson. Although Johnson & Johnson contractually had the right to shelve Meditemp, plaintiffs' understanding of the significance of that provision unquestionably could have been colored by an oral promise that, despite its lack of legal obligation, Johnson & Johnson intended to fully promote the product. On the other hand, this is not a situation where the complaining party had no notice that the deal was not as anticipated. Unlike a case involving an "as is" clause, plaintiffs here specifically negotiated the contested issue of whether Johnson & Johnson would promote Meditemp aggressively. In effect, section 12.1 of the contract states that even if Johnson & Johnson has misrepresented its plans,

4. Speculating on exceptions, however, would serve no present purpose.

the parties have agreed that the AMEC principals will not have legal recourse on this particular point.

We are not without guidance in determining how the Massachusetts Supreme Judicial Court would view this type of fraud claim. In *Plumer v. Luce*, 310 Mass. 789, 39 N.E.2d 961 (1942), the plaintiff transferred $17,000 worth of stock to the defendant. The plaintiff alleged that the defendant fraudulently misrepresented what he intended to do with the stock. She claimed that he promised to act as her broker, buying and selling stocks for her when, in fact, he intended to sell the stock and use the proceeds for his own living expenses. The letter of agreement she signed stated, however, in relevant part:

> Before you consent to accept my note for three years in consideration of the loan of $17,000 I want to be sure that you fully understand the implications of the transaction.... It is my intention, as you know, to use the moneys received from you in return for my note in the purchase and sale of stock. You must understand, however, that in the event that you decide to accept my note I shall be under no obligation so to do and if I do you will have no claim upon the stock itself but your sole claim will be against me personally for the repayment of the money which you loan me. In other words this transaction amounts to nothing more than a loan by you to me and my obligation to you created by this note will be solely a contractual relation. I want it further understood in the event that you decide to make me the loan that you are relying upon no representations other than are herein stated.

*Id.* at 794, 39 N.E.2d 961. In rejecting the plaintiff's fraud claim, the court stated:

> [T]he contention of the plaintiff as to the alleged misrepresentation comes down to this: that she is now seeking to turn one of the terms of a proposed 'arrangement' into a misrepresentation of material facts upon which she had a right to rely, and did rely to her damage, so that she may have voided an entirely different contract that she made. The agreement that [plaintiff] signed may not read very much like what she says the proposed arrangement was, but ... we are of opinion that she cannot rightly contend that one of the terms of a proposed agreement that never came into existence can be used as a basis upon which to bring the case at bar within the case of *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551.

We recognize that there are differences between *Plumer* and the present case. A party who signs an agreement like the one in *Plumer* containing an express disclaimer of the immediately preceding statement of intention perhaps should be deemed to have more notice of the other party's possible failure to do the intended act than the plaintiffs in the case before us, where the language of "no obligation" is not juxtaposed with the alleged misrepresentation. In addition, in *Plumer,* the court noted that the plaintiff's conduct after signing the agreement tended to show that she considered the defendant's note as the basis of any claim, suggesting that she regarded the agreement that she signed as in effect.

Nevertheless, the situations are substantially similar. We therefore conclude that the Massachusetts Supreme Judicial Court would reject as a matter of law plaintiffs' fraud claim based on Johnson & Johnson's alleged promise to aggressively market Meditemp. Certainly in this case, where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue. While we do not condone misrepresentations in contract negotiations, we also reject the notion that courts or juries should rewrite a fully negotiated contractual agreement that so precisely sets out the rights and obligations of two sophisticated parties. We do not believe this rule of law awards undue protection against fraud claims. It means only that a knowledgeable buyer should not sign a con-

tract that conflicts with his or her understanding of the agreement.

■ (2) *That Johnson & Johnson corporate policy prevented it from paying royalties on foreign sales.* We have no trouble concluding that, as a matter of law, this alleged misrepresentation could not have been material to plaintiffs' decision to enter the contract. It makes no sense to say that plaintiffs were induced to enter the contract by a statement that they would *not* receive a certain benefit. Even if the statement was false, it was not actionable as a fraudulent misrepresentation.

■ (3) *That Johnson & Johnson was pursuing only an "IVAC–type" thermometer.*[5] This statement is false only if Survalent's pulse-counting feature makes it incorrect to describe Survalent as an "IVAC–type" thermometer. The jury heard conflicting evidence on this point. For example, Johnson & Johnson's witness, Michael Dyer, stated that "IVAC–type" was understood in the industry to designate a large, battery-charged unit with a red light display that was designed to hang around the neck—a description that accurately describes the Survalent thermometer. Glen Weinberg, a former Johnson & Johnson employee who worked on the Meditemp project while at the company, testified through deposition that he would assume that an "IVAC–type" thermometer would not have a pulse-counting feature. We reproduce a brief portion of his testimony:

Q: "If you later found out that the thermometer that was described to you as an IVAC–type thermometer had a time temperature feature, would you feel that the thermometer had been accurately described to you?"

Witness: "No."

Q: "Why not?"

Witness: "I would feel that a very important part of the description was left out...."

Although the thermometers displayed to us at oral argument demonstrate that "IVAC–type" unquestionably is an accurate *physical* description of Survalent, as a contrast to Meditemp, we can not say as a matter of law that such a description is not deceptive as a result of what it omits about the thermometer's other characteristics. The jury heard the conflicting testimony, viewed the thermometers, and may reasonably have concluded that, in the context of this case, the statement was false.

Defendants also fail to persuade us that, even if the statement arguably was false, there was no basis upon which a jury could find the other elements of fraud. We reject the notion that any contract provision negated either the materiality of the "IVAC–type" statement or reasonable reliance upon it. The contract did not state that Johnson & Johnson's other electronic thermometer contained a pulse-counting feature—a statement that would directly contradict plaintiffs' alleged interpretation of the "IVAC–type" comment, and defeat reasonable reliance. Although the contract gave Johnson & Johnson the right to market "any" other thermometer, such a blanket provision is akin to the general disclaimers that are not impervious to fraud. A jury reasonably could find that plaintiffs entered the contract on the assumption that, and largely for the reason that, Meditemp was Johnson & Johnson's only electronic thermometer project that offered a pulse-counting feature, increasing the likelihood of Meditemp's success and assuring Johnson & Johnson's loyalty to it.

Defendants also contend that because the executive who made the "IVAC–type" comment, Mr. Hartman, provided plaintiffs with enough information to identify the thermometer at issue as the Survalent, there is no possible inference of an intent to deceive. But the statement was uttered at the closing, at a time when plaintiffs presumably were prepared to finally conclude a long-brewing deal. In those cir-

---

**5.** In this discussion, we consider misrepresentations (2) and (3) as listed in Section I, *supra.* The allegedly fraudulent aspect of each of those misrepresentations is the description of the Ar-

brook thermometer, Survalent, as an "IVAC–type" thermometer. We therefore treat these two misrepresentations as one, as did the district court.

cumstances, we think a jury reasonably could infer that Mr. Hartman knew that the "IVAC–type" description, along with the additional information, would allay plaintiffs' concerns sufficiently for the moment, allowing the contract to be signed. Moreover, Mr. Hartman's provision of further information made it reasonable for plaintiffs to rely on his description of the other thermometer. In essence, Mr. Hartman was telling them, "It's an IVAC–type thermometer, and here's the specific information so you can confirm that."

In a broader attack on the element of intent, defendants argue that the evidence failed to show a rational motive for Johnson & Johnson to deceive plaintiffs, and that it is therefore improper to draw inferences of fraud from defendants' conduct. Plaintiffs primarily argued that Johnson & Johnson purchased Meditemp to eliminate it as a competitor to the Survalent thermometer. Johnson & Johnson argues that several undisputed facts establish the irrationality of this theory, including that the company spent several million dollars to market Meditemp; that Survalent was not purchased until well after Meditemp was acquired; and that the royalty arrangement with plaintiffs gave Johnson & Johnson every economic incentive to market Meditemp if it could do so profitably.

■ We think this a forceful argument, and we gave serious consideration to directing the district court to grant Johnson & Johnson a judgment n.o.v. on this basis, particularly since we are dubious that a jury would find fraud based solely on the one alleged misrepresentation that we deem actionable. We decided against doing so, however, for three reasons. First, the "IVAC–type"statement is a significant one in the context of the case. Second, even if it is implausible that Johnson & Johnson intended to completely suppress the Meditemp in favor of the Survalent, we think a reasonable jury conceivably could have found that Johnson & Johnson defrauded plaintiffs into selling their business at an unfair price so that Johnson &

Johnson would be able to control the marketing of these potentially competing products. Finally, if we must err, we choose to do so on the side of preserving plaintiffs' right to a jury trial.

Notwithstanding our reluctance to take this case from the jury on this point, we would urge the district court on remand to consider Johnson & Johnson's argument on motive and, if Johnson & Johnson can rebut through affidavits our theory and any other proposed motive offered by plaintiffs, it should consider, if filed, a renewed motion for summary judgment. *Cf. Goldstein v. Kelleher,* 728 F.2d 32, 39 (1st Cir.1984) (in considering directed verdict for defendant, plaintiff is entitled to "the benefit of every legitimate inference," but "such inferences may not rest on conjecture or speculation, but rather the evidence offered must make 'the existence of the fact to be inferred more probable than its nonexistence.' ") (quoting *Carlson v. American Safety Equipment Corp.,* 528 F.2d 384, 386 (1st Cir.1976).)

■ Finally, we have some doubt that plaintiffs can show that they were injured as a result of reliance on the alleged misrepresentation regarding Survalent. We think it insufficient for plaintiffs to produce statistics showing that their business was worth more than Johnson & Johnson paid for it. Rather, plaintiffs also need to demonstrate that if they knew Survalent had a pulse-counting feature, they would have demanded more money from Johnson & Johnson, and that Johnson & Johnson would have been likely to pay a higher sum. Or they would need to show that they would have chosen not to sell the business, and that, despite their financial problems, they would have earned more from their business than they received from Johnson & Johnson. Despite our doubts, we can not say that it is impossible for a jury focusing on this issue to find that Johnson & Johnson would have paid a higher figure.

■ (4) *The Alleged Nondisclosures.* It follows logically from our earlier holding on Johnson & Johnson's alleged promise to

market Meditemp aggressively that the alleged failure to tell plaintiffs that Johnson & Johnson intended to suppress Meditemp is nonactionable. Similarly, our conclusion that Johnson & Johnson's "IVAC–type" statement about Survalent *is* susceptible to a finding of fraud means the company's failure to tell plaintiffs that Survalent had a pulse-counting feature also is actionable. We conclude that the other two alleged omissions—relating to the Meditemp patent and the patent proceeding—fall within the rule enunciated in *Nei v. Burley*, 388 Mass. 307, 310, 446 N.E.2d 674 (1983), that a "mere nondisclosure" is not actionable.[6] Although an incomplete or partial statement may be the basis for fraud when only full disclosure would avoid deception, Johnson & Johnson made no reference to the status of either Meditemp or Survalent's patents. Thus, even if patent information would have been material to plaintiffs, Johnson & Johnson was under no obligation to reveal it.

To sum up our conclusion on the issue of common law fraud, we hold that, unless the district court rules out the possibility of fraudulent intent as a matter of law, a new trial must be held and the jurors may consider only whether plaintiffs were fraudulently induced into entering the agreement by the statement that Survalent was an "IVAC–type" thermometer and the converse failure to disclose that the Survalent had a pulse-counting feature.

### III.

Plaintiffs contend that the district court erred in directing a verdict against them on their breach of contract claim. The contract that plaintiffs allege Johnson & Johnson breached was a side agreement executed at the closing on June 17, 1976.[7] This agreement, in the form of a letter, was keyed to paragraph 2.4 of the main contract, which provided that if Johnson & Johnson ever discontinued Meditemp, the company would have the option to reassign to AMEC the assets originally purchased, and to sell or convey to AMEC, upon mutually agreed terms, additional assets related to the marketing of Meditemp. Under the terms of the side agreement, Johnson & Johnson also agreed (1) to give AMEC 90 days advance written notice of any such reassignment of assets; (2) to consign to AMEC "key pieces of equipment necessary to manufacture electronic thermometers and disposable probe covers, for a period of 6 months commencing with the date of such reassignment;" and, during that six-month period, to "negotiate and attempt to reach an agreement on terms and conditions for the sale of such Additional Assets to AMEC." [8]

In ruling on defendants' motion for directed verdict, the district court stated "there is an insufficiency of evidence that has been presented by plaintiffs to allow a jury to find a breach of contract in this case" and held "as a matter of law that that theory of liability cannot be advanced to a jury." To uphold a grant of a directed verdict, we must find that, viewing the evidence and all reasonable inferences in favor of the opposing party, " 'reasonable jurors could come to but one conclusion.' " *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 253 (1st Cir.

---

**6.** To the extent that failure to reveal that Survalent infringed part of the Meditemp patent is equivalent to the failure to disclose that Survalent had a pulse-counting feature, the alleged misrepresentation is covered by the alleged nondisclosure that we already have concluded is worthy of jury determination.

**7.** At trial, plaintiffs argued three bases for a breach of contract claim: (1) violation of a provision in the main contract stating that all warranties and representations were true; (2) violation of the covenant of good faith and fair dealing; and (3) failure to abide by the side

agreement. Plaintiffs apparently have abandoned the first two theories on appeal.

**8.** Plaintiffs seem to argue that defendants also breached a contractual agreement to return a "going business" to them. It may well be that the provisions of the side letter agreement would be valuable to plaintiffs only in the event the Meditemp business still was viable at the time of the reassignment of assets, but the contract does not assure plaintiffs that Johnson & Johnson would be returning a "going business."

1986) (quoting *Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.1984)).

The relevant facts begin with Johnson & Johnson's decision on November 13, 1979 to phase out the Meditemp business.[9] Plaintiffs were told of the decision at a meeting three days later, and the information was confirmed in writing. At the November 16 meeting, the parties discussed Johnson & Johnson's options under section 2.4 of the contract, which were either to pay off the remaining guaranteed royalties or to reassign the assets as described above. The parties also discussed the possibility of a joint effort to sell the Meditemp business to a third party. No decisions were made at that time.

On January 17, 1980 the parties met again, and they specifically acknowledged that the meeting constituted negotiations under section 2.4 of the agreement. The result of the meeting was an agreement to cooperate in trying to sell the Meditemp business to a third party by July 1, 1980, at which time Johnson & Johnson would begin the actual shutdown of the Meditemp plant.

No third party sale developed. On July 16, plaintiffs demanded immediate negotiations for the purchase of the "additional assets" related to marketing Meditemp. The next day, in a conference call, plaintiffs offered to dismiss this lawsuit in exchange for all such additional assets and "the nondisturbance of Meditemp thermometers in the field." Johnson & Johnson refused the offer, and also refused to reassign the assets as specified in section 2.4 until plaintiffs posted a surety bond sufficient to cover the amounts claimed in Johnson & Johnson's counterclaims in the instant lawsuit.[10] Another meeting was held on July 21, 1980, but again no deal was struck.

In August 1980, Johnson & Johnson began to shut down the Meditemp business. The district court denied plaintiffs' request for a temporary restraining order preventing Johnson & Johnson from closing the business, and Johnson & Johnson then bought back and disposed of Meditemp thermometers being used in hospitals. A number of items related to the business were disposed of at the Randolph town dump. In compliance with section 2.4 of the contract, Johnson & Johnson reassigned to AMEC patents and patent applications related to Meditemp. It also telecopied to plaintiffs a list of physical assets, including the original AMEC assets and additional Meditemp assets.

We believe that Johnson & Johnson technically violated the provisions of the side agreement by failing to reassign the original assets and to consign the other assets *before* the specified period of negotiations. But in light of the circumstances, we find no error in the district court's conclusion that plaintiffs failed to establish a viable claim for contract damages.

We note first that the side agreement was never raised by plaintiffs throughout the period of discussion over the future of the Meditemp business. Defendants admittedly forgot that the side agreement existed and it appears that plaintiffs also did not recall it until they began preparing for trial. In any case, we conclude that plaintiffs' failure to request the assets at the outset of the negotiations period, or at any time during the six-months from January to June 1980, means that the breach was not a material one. Thus, Johnson & Johnson's contract violations would have no impact on the validity of the contract as a whole. *See* A. Corbin, 4 *Corbin on Contracts* § 946 (1951) (contrasting "total breach" and "partial breach"). At best, plaintiffs would have a claim for damages resulting only from the failure to reassign and consign assets before, rather than after, the negotiations.

But we fail to see any injury stemming from breach of the side agreement

---

**9.** The description of the events leading to the shutdown of the Meditemp business is drawn largely from defendants' brief. Plaintiffs do not suggest that the significant facts are inaccurate.

**10.** These counterclaims were dismissed prior to trial.

provisions, and plaintiffs suggest none. Since plaintiffs never attempted to purchase the additional Meditemp assets during the negotiations period, Johnson & Johnson's failure to consign them to plaintiffs had no apparent impact. The only injury alleged by plaintiffs in their brief is the lost value of their business when it was turned over to Johnson & Johnson in 1976. While this may be the measure of damages for fraudulent inducement into the contract, such an injury has no relationship to the delayed assignment of assets. In short, plaintiffs failed to establish that Johnson & Johnson's technical breach of minor provisions of the agreement caused any compensable injury. *See* A. Corbin, 4 *Corbin on Contracts* § 946, at 813 ("If a contractor's failure of performance causes such slight harm that the courts will give no remedy therefor, adopting and applying the maxim *de minimis non curat lex,* it is proper to say that there has been no breach of duty").[11]

### IV.

Plaintiffs also claim that, in light of the jury's finding of fraud, it was error for the district court to find for defendants on the claim under Mass.Gen.Laws Ann. ch. 93A. Plaintiffs argue that the seventh amendment required the district court to make the jury determination of fraud binding for purposes of the court's decision on the chapter 93A claim.

■ We decline plaintiffs' invitation to reconsider this issue, which we decided only last year in *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049 (1st Cir.1985). We therefore find no error in the district court's conclusion that defendants did not violate chapter 93A.[12]

### V.

Plaintiffs claim that the district court erred in dismissing their antitrust claims on the ground of standing. The court relied upon a line of cases, including one from the First Circuit, holding that a seller of a business lacks standing to sue for antitrust violations when its alleged injury was not "antitrust injury", in other words, when the injury did not result from an unreasonable effect on *competition* as distinguished from its effect on a particular competitor. *See A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753, 754 (1st Cir.1980), *aff'g* 481 F.Supp. 1297 (D.Mass.1980); *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1373–79 (8th Cir.1983), *cert. denied,* 105 S.Ct. 219 (1984); *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1235 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981).

■ The alleged injury to plaintiffs here unquestionably flowed from the alleged fraud and not from suppressed competition in the electronic thermometer market. As in *A.D.M. Corp.,* 628 F.2d at 754, "[i]f the sale of assets had an effect on competition, it would have occurred whether or not appellant was harmed." In support of their argument, plaintiffs cite only the dissenting opinion in *McDonald v. Johnson & Johnson.* We see no reason in this case to depart from our own prior conclusion, however, and therefore affirm the dismissal of plaintiffs' antitrust claims.

### VI.

Plaintiffs' final argument is that the district court erred in vacating its original award of prejudgment interest. We choose not to decide this issue of state law at this time. As noted above, in light of the limited claims of fraud that a jury may properly consider, we think it likely that defendants

---

11. We suspect that plaintiffs' failure to prove a viable contract claim stems from their failure to formally plead such a claim. We decline, however, to consider defendants' argument that plaintiffs should be foreclosed from making this claim at all, and instead follow the district court's decision to consider the claim on the merits.

12. Although we need not address this issue in light of our disposition of the fraud claim, the interests of judicial economy prompted us to dispose of it now rather than at the time of a possible later appeal.

would prevail if a new trial is held. We therefore think it premature to interpret Massachusetts law. In the unfortunate event this case reappears before us, we will do so at that time.[13]

*The judgment of the district court is affirmed in part, reversed in part, and remanded for a new trial. No costs.*

---

**13.** We do not consider defendants' argument on the amount of damages. In the event a new jury finds liability for fraud, it should reach its own determination of plaintiffs' damages. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.