7 F.3d 218
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Gary A. COOPRIDER, Plaintiff, Appellant,
v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant, Appellee.
 No. 93-1114.
 United States Court of Appeals,
First Circuit.
 Sept. 29, 1993.
 
 Appeal from the United States District Court for the District of Massachusetts
 Charles B. Manuel, Jr. with whom James B. McKinney, Jr. and Manuel & McKinney were on brief for appellant.
 Neil Jacobs with whom Susan M. Curtin, Ann K. Bernhardt and Hale and Dorr were on brief for appellee.
 D.Mass.
 AFFIRMED.
 Before Torruella, Circuit Judge, Campbell, Senior Circuit Judge, and Boudin, Circuit Judge.
 BOUDIN, Circuit Judge.
 
 
 1
 Gary A. Cooprider brought this diversity action against his former employer, John Hancock Mutual Life Insurance Company ("John Hancock"), claiming breach of contract, bad faith breach of contract, intentional interference with contractual relations, fraud, and unfair and deceptive trade practices under Mass. Gen. L. ch. 93A. The district court granted summary judgment for John Hancock on all claims, and Cooprider brought this appeal. We affirm.
 
 
 2
 Cooprider had been associated with John Hancock's European operations for brief periods in 1974 and 1983. In late 1988, Cooprider spoke to J. Paul McDonnell, a John Hancock vice president in Boston, about renewing that association. McDonnell directed Cooprider to contact Charles Woolley, John Hancock's European general agent. In January 1989, Cooprider and Woolley met in Germany and discussed Cooprider's joining the company in a supervisory capacity.
 
 
 3
 They met again in March in London and on March 6, 1989, Cooprider and Woolley initialed a one-page handwritten document, drafted by Cooprider, entitled "Agreement by Charles Woolley with GA Coop Cooprider" ("Coop" is Cooprider's nickname). This document says, among other things, that "Woolley agrees to groom GA Coop Cooprider to take over the agency for John Hancock in Europe" when Woolley stepped down no later than June 6, 1992. Cooprider subsequently returned to his home in Germany retaining the original handwritten document.
 
 
 4
 Shortly thereafter, Woolley asked Cooprider to draft a "letter of understanding" for Woolley to send to McDonnell in the John Hancock home office in Boston. Cooprider complied, and a letter dated March 7, 1989, purportedly signed by Cooprider,[1] was sent by Woolley to McDonnell on March 8. The letter of understanding differed significantly from the handwritten agreement. In particular, it did not contain any provision for Cooprider to take over the European agency or establish a retirement date for Woolley. Cooprider wrote:
 
 
 5
 It is my understanding, from discussions with you, that John Hancock has agreed in exchange for my goal of bringing an estimated eight (8) agents on board ..., John Hancock will pay me $5,000 per month for twelve (12) months or the normal C.D.P. compensation formula, whichever is greater. It is also my understanding that some expenses of recruiting will be shared as budget allows.
 
 
 6
 With my considerable experience at marketing and recruiting John Hancock has an excellent back-up until your retirement at which time, based on my successful accomplishments and ability to be a Hancock team player, I will receive first consideration for the right to lead the John Hancock operations in Europe.
 
 
 7
 Neither the letter of understanding nor an accompanying cover letter from Woolley contain any reference to the handwritten agreement. Cooprider acknowledges receiving a copy of Woolley's cover letter by facsimile the day it went out to McDonnell.
 
 
 8
 On March 14, 1989, McDonnell advised Woolley of his agreement with the correspondence he had received. He made no reference to the handwritten agreement, and he later said that he was unaware of the agreement. However, he asked Woolley to clarify with Cooprider that Cooprider was to work exclusively with John Hancock. Woolley did so and Cooprider later wrote to inform John Hancock that he had terminated his contracts with the five insurance companies that he had represented in Europe until then.
 
 
 9
 On or about March 14, 1889, Thomas Horack, another John Hancock vice president located in Massachusetts, approved a request form from Woolley to employ Cooprider. An attachment specified Cooprider's first year monthly compensation and indicated that thereafter compensation would be in accordance with a formula, apparently based on business development. On April 1, 1989, Cooprider began work for John Hancock. After five months, Cooprider was terminated, apparently because of dissatisfaction with his performance.
 
 
 10
 This action ensued. Limited discovery, directed to dispositive issues, was allowed. John Hancock in due course moved for summary judgement. On December 29, 1992, Judge Zobel filed a memorandum granting summary judgment in favor of John Hancock; her determinations are described later in this opinion. This appeal followed.
 
 
 11
 Summary judgement is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To withstand a summary judgment motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). On appeal review is plenary and inferences are resolved in favor of the party opposing summary judgment. FDIC v. Longley, 988 F.2d 270 (1st Cir. 1993).
 
 
 12
 Cooprider's second amended complaint defines the contract at issue for purposes of all claims as a "long term management contract," arising out of the handwritten agreement signed by Cooprider and Woolley, under which the plaintiff was to be engaged as John Hancock's director of marketing and manpower development for a period of three years after which he was to succeed Woolley as European general agent for John Hancock. In granting summary judgment on the contract claim, the district court found that Cooprider had failed to show that Woolley had authority to enter into such a contract or that the John Hancock home office approved or ratified such a contract.
 
 
 13
 The record amply supports the district court's conclusion and shows that there was no factual issue for a jury. Cooprider's deposition shows that he knew that Woolley lacked authority to enter into a binding agreement with him on behalf of John Hancock. As to approval or ratification, Cooprider proffered no evidence to contradict the sworn statements of McDonnell, Horack and Woolley that the handwritten agreement was not sent to John Hancock's home office nor were its contents ever communicated to the home office at any time prior to Cooprider's termination.
 
 
 14
 In an attempt to create a factual dispute, Cooprider contends that statements by Woolley in two affidavits are so contradictory as to raise serious doubts regarding his credibility. These alleged contradictions, however, appear to be largely manufactured. In any event, the evidence of those at the home office is consistent with Woolley's statements and Cooprider offers nothing to contradict it. We have held that to defeat summary judgment the nonmoving party must provide more that "conclusory allegations, improper inferences, and unsupported speculation." Medina-Munoz v. R. J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).
 
 
 15
 Record evidence on the issue of authority also renders summary judgment appropriate on Cooprider's claim that he was fraudulently induced to enter into a relationship with John Hancock based on misrepresentations regarding the terms of his employment. In order to make out a claim for fraudulent misrepresentation, a party must show reasonable reliance on the alleged misrepresentations. Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986). Cooprider was admittedly aware of Woolley's lack of authority. Any reliance on the handwritten agreement was, therefore, unreasonable as a matter of law.
 
 
 16
 On appeal, Cooprider argues that even if the handwritten agreement did not bind John Hancock to appoint Cooprider as Woolley's successor, at least he had a one-year agreement with John Hancock which the latter breached by discharging him after five months. This claim does not appear in the second amended complaint and there is no indication that it was presented to Judge Zobel. We will not normally consider claims made for the first time on appeal, Jones v. City of Somerville, 735 F.2d 5, 7 (1st Cir. 1984), and see no reason here for an exception to this rule. We note in passing that Cooprider seems to have very little basis for this newly developed claim.[2]
 
 
 17
 Cooprider further alleges that John Hancock terminated his employment to retaliate for his complaints about supposed illegal requirements imposed on John Hancock recruits in Europe. Massachusetts allows claims for bad faith termination where an at-will employment contract is terminated for reasons contrary to public policy. DeRose v. Putnam Management Co., 398 Mass. 205, 496 N.E.2d 428 (1986). The claim of retaliation was not presented to the district court except in the most fragmentary and abbreviated way, and we decline to consider it. Cooprider did argue to the district court that the alleged illegal practices were violations of chapter 93A and we consider that claim below.
 
 
 18
 Cooprider also asserts that John Hancock intentionally interfered with contractual relationships. The district court explained that Cooprider could not base a cause of action on his own voluntary termination of his relationships with other insurance companies. On appeal, Cooprider says that he does not dispute this ruling but he complains that the district court failed to discuss his claim that John Hancock interfered with Cooprider's contractual relationships with agents whom he brought with him to John Hancock. Once again, we do not think that Cooprider has preserved this claim.
 
 
 19
 It is true that the complaint contains a brief reference to Cooprider's severed relationships not only with other insurance companies but with other agents who served such companies. But his opposition to summary judgment discussed only Cooprider's own relationship with those companies, and the resurrection on appeal of a claim regarding Cooprider's agents comes too late. We add that Cooprider's brief does not illuminate the nature of Cooprider's alleged contractual relationships with those agents or explain what interference he claims to have occurred.
 
 
 20
 Finally, plaintiff claims violations of Mass. Gen L. ch. 93A § 11, which provides "a private right of action to a person who is engaged in business and suffers a loss as a result of an unfair or deceptive act or practice by another person also engaged in business." See Nader v. Citron, 372 Mass. 96, 360 N.E.2d 870 (1977). Cooprider's complaint gave no hint of the basis for this claim, merely alleging at the end of the complaint that everything previously alleged in the entire document made out a violation of chapter 93A. In discussing chapter 93A, Cooprider's opposition to summary judgment referred to the allegedly illegal practices that were the subject of his post-termination letter. It then went on to assert that the acts underlying his contract claim also gave rise to liability under chapter 93A.
 
 
 21
 The district court dismissed the chapter 93A claim on the ground that it related to acts occurring primarily abroad and was therefore outside chapter 93A's jurisdictional requirements. See Mass. Gen L. ch. 93A, § 11. On appeal, Cooprider ignores his prior suggestion that the contract claim falls under chapter 93A and Cooprider argues in this court that the supposed illegal practices occurred primarily in Massachusetts. It is quite likely that the district court's remarks were directed, quite appositely, only to Cooprider's effort in opposing summary judgment to recast his contract claim as one under chapter 93A.
 
 
 22
 There is, however, not the slightest reason to remand to obtain the district court's evaluation of Cooprider's alternative chapter 93A claim based on the supposed illegal practices. As to those, Cooprider argues that John Hancock was making its European agents register as Massachusetts agents, perjuriously giving John Hancock's in-state address as their residences. Assuming arguendo that this occurred-and John Hancock is mysteriously silent on this point-there is no hint whatever in Cooprider's complaint, opposition to summary judgment or principal brief in this court as to how the requirement or the perjury themselves directly affected Cooprider.
 
 
 23
 Finally, Cooprider argues that the district court denied him the opportunity to conduct adequate discovery. The district court held a scheduling conference at the outset of the litigation at which Cooprider's counsel agreed to a 60-day timetable for discovery on the dispositive issues of authority and ratification. Cooprider apparently made no effort during that period to depose the three witnesses, McDonnell, Horack and Woolley, most likely to possess the necessary information. The district court acted well within its discretion in denying Cooprider's later motion to permit him to conduct numerous depositions at home and abroad.
 
 
 24
 This case appears to have had no merit from the outset. The district judge is to be congratulated, not faulted, for focusing the discovery, holding the parties to the scheduling order, and crisply disposing of Cooprider's diffuse claims on summary judgment. Nothing in the district court's decision warranted this appeal.
 
 
 25
 Affirmed.
 
 
 
 [1]
 Cooprider claims to have signed a different version of this letter dated March 6, 1989. However, he admits that the signature on the March 7 version appears to be his and has presented no evidence that John Hancock received the earlier draft. The two drafts differ in one particular. The March 6 version states that Cooprider will have "earned the right" to lead John Hancock operations in Europe. The March 7 version provides that he will receive "first consideration" for the right to lead based on his "successful accomplishments"
 
 
 [2]
 The premise of the claim appears to be the letter that Cooprider drafted, dated March 6 or March 7, to be forwarded to John Hancock's headquarters. The letter in the record does nothing more than specify monthly compensation for Cooprider during his first 12 months. It would be quite a stretch to convert what appears to be an employment relationship of indefinite duration, which is normally terminable at will, into a commitment by John Hancock to retain Cooprider for one year