282                               81 Mass. App. Ct. 282 (2012)

Greenleaf Arms Realty Trust I, LLC *v.* New Boston Fund, Inc.

## GREENLEAF ARMS REALTY TRUST I, LLC, & others[1] *vs.* NEW BOSTON FUND, INC., & others.[2]

No. 10-P-2192.

Suffolk. September 9, 2011. - February 16, 2012.

Present: BERRY, MEADE, & MILKEY, JJ.

*Contract,* Settlement agreement, Release from liability, Merger, Misrepresentation. *Practice, Civil,* Dismissal, Fraud, Frivolous action. *Fraud. Deceit. Fiduciary. Partnership,* Fiduciary duty.

In a civil action alleging, inter alia, that the defendants engaged in fraudulent conduct in entering a settlement agreement with the plaintiffs, a Superior Court judge erred in allowing the defendants' motion to dismiss on the grounds that exculpatory, disclaimer, and merger provisions of the agreement barred the plaintiffs' claims, where the plaintiffs more than adequately alleged in their complaint that they were induced to enter the agreement by the defendants' fraudulent conduct [288-290], where the question whether the plaintiffs justifiably relied on the defendants' representations was a question of fact [290], and where the defendants' alleged representations concerning the value of a parcel of real property formed the basis of an actionable deceit claim [290-291].

In a civil action alleging, inter alia, that the defendants committed a breach of a fiduciary duty owed to the plaintiffs, who were limited partners in a partnership created under a settlement agreement between the plaintiffs and the defendants, a Superior Court judge erred in allowing the defendants' motion to dismiss, where the plaintiffs made a sufficient showing that the defendants had not disavowed any and all fiduciary obligations to the plaintiffs as limited partners, in that the question whether the defendants owed fiduciary duties to their limited partners in the unique context involving a settlement of pending litigation was a mixed question of law and fact. [291-293]

CIVIL ACTION commenced in the Superior Court Department on July 2, 2009.

A motion to dismiss was heard by *Margaret R. Hinkle, J.,*

---

[1]Joseph P. Baglione and Faye P. Baglione.

[2]New Boston Fund VI; New Boston Investor Fund, L.P. VI; New Boston Huntington VI Limited Partnership; Jerome L. Rappaport, Jr.; Jerome L. Rappaport, Sr.; James W. Rappaport; Janet F. Aserkof.

and a motion for sanctions for violation of Mass. R. Civ. P. 11(a) was also heard by her.

*Michael C. McLaughlin* for the plaintiffs.

*Mark A. Berthiaume* for the defendants.

BERRY, J. In 2003, Joseph and Faye Baglione (husband and wife) entrusted $1.3 million — proceeds derived from a sale of income property — with New Boston Fund, Inc. (New Boston Fund), a locally-based investment management firm. New Boston Fund had promised them an investment vehicle to shelter the monies from gains taxes, as permitted by § 1031 of the Internal Revenue Code. 26 U.S.C. § 1031. That plan went awry, and the Bagliones incurred tax liabilities and fees in excess of $300,000. Litigation ensued (first lawsuit). After some months of negotiation, the Bagliones and all named defendants in the first lawsuit, including New Boston Fund, reached a settlement agreement in May, 2007, in which the parties agreed to establish two tenant-in-common structured investments (TIC agreements) in two commercial properties, one of which was in Westborough.[3]

Allegedly, when the parties entered into the settlement agreement, the Westborough property was already (or perilously close to being) in default on its mortgage loan. Its sole tenant later declined to renew its lease and the property further declined sharply in value. The Bagliones, who had been kept in the dark as to these material events, lost their entire principal investment in the Westborough property. It is further alleged that, at the time of the settlement, New Boston Fund had led the Bagliones to reasonably believe the Westborough property was a suitable replacement for investment in order to achieve a successful tax deferred § 1031 "like-kind" exchange, an essential component to the deal that was reached by the parties.

Accordingly, in 2009, the Bagliones commenced this action against New Boston Fund, its principals, and certain affiliated entities (collectively, New Boston),[4] alleging that they had been the victims of a fraudulent scheme carried out by New Boston,

---

[3]The third plaintiff in this action, Greenleaf Arms Realty Trust I, LLC (Greenleaf), is the entity that entered into the TIC agreements on behalf of the Bagliones. Where relevant, our reference to the Bagliones includes Greenleaf.

[4]The defendants in the first lawsuit and the defendants in this action are not identical. For events prior to the filing of this action, we refer to the defendants

which induced them to enter into the settlement agreement and related TIC agreements. Their complaint alleged that New Boston had not only misrepresented facts bearing on the settlement agreement and the TIC agreements, but had also breached fiduciary duties owed to them, as limited partners, by failing to make a full and honest disclosure of the facts surrounding the proposed § 1031 like-kind exchange transaction.

In lieu of a responsive pleading, New Boston filed a motion to dismiss the complaint, pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974). A judge allowed the rule 12 motion, ruling the complaint failed to allege such facts plausibly suggesting an entitlement to relief. In essence, the judge concluded that the Bagliones' claims were barred by the exculpatory, disclaimer, and merger provisions of the settlement agreement. On appeal, the Bagliones claim that the allowance of the rule 12 motion was error as matter of law. We agree.

The judge, on the other hand, denied summarily New Boston's motion seeking sanctions against the Bagliones' trial counsel, pursuant to Mass.R.Civ.P. 11(a), as amended, 456 Mass. 1401 (2010). New Boston cross appeals from the denial. We affirm.

*Background.* We summarize the factual allegations of the Bagliones' 2009 complaint,[5] reserving some detail for our discussion of the legal contentions advanced by the parties in the cross appeals.

a. *Facts.* As of 2002 and for some years prior, the Bagliones were the sole beneficiaries of a nominee realty trust that held title to an apartment building in Quincy (Quincy property).[6] The trust was Joseph's sole source of income, and the Bagliones believed that they would maintain ownership of the Quincy property in this form for tax and estate planning purposes. The Bagliones had not listed the Quincy property for sale. Sometime

---

collectively as New Boston Fund. For events after the filing of this action, we refer to the defendants collectively as New Boston. All are affiliated with New Boston Fund and New Boston.

[5]In doing so, we take into consideration the exhibits attached to the complaint. *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000).

[6]A nominee trust is commonly used in the Commonwealth as a surrogate means to hold legal title to real estate. *Penta* v. *Concord Auto Auction, Inc.*, 24 Mass. App. Ct. 635, 639 (1987). See Birnbaum & Monahan, The Nominee Trust in Massachusetts Real Estate Practice, 60 Mass. L. Q. 364 (1976).

in 2002, a New Boston Fund representative solicited the Bagliones and proposed that they sell the Quincy property and invest the sale proceeds in real estate funds that New Boston Fund privately managed for its individual and institutional investors. New Boston Fund unequivocally represented that, by doing so, the Bagliones could enjoy both the benefits of a "tax-free exchange investment" permitted by § 1031, and "extraordinary rates of return" on their investment due to New Boston Fund's expertise. The Bagliones took such action.

In November, 2002, the Bagliones, through their realty trust, sold the Quincy property for $2.7 million.[7] Some $1.3 million of the sale proceeds were ultimately invested in New Boston Fund's Fund V and Fund VI. By doing so, the Bagliones became limited partners in these funds.

New Boston Fund's promises of a tax-free, like-kind exchange did not come to pass. The Bagliones incurred heavy tax liabilities as a result of New Boston's action in liquidating a particular asset in Fund V's portfolio. This led the Bagliones to commence the first lawsuit in 2006 against certain New Boston Fund entities, seeking damages. The parties and their counsel then engaged in negotiations over a span of several months.

Among other proposals discussed to resolve both the tax liability issues and pending litigation, New Boston Fund offered to invest the Bagliones' Fund VI money in tenant-in-common interests in two buildings: the then tenant-occupied office building located in Westborough, and a similar property in Franklin, Indiana. Both commercial properties were owned by New Boston Fund.

Transactional documents and settlement papers were drawn up by counsel. At all times, New Boston Fund had custody of the monies invested by the Bagliones, as limited partners of New Boston Fund's Fund V and Fund VI. The Bagliones made it known they were acting under a belief that New Boston Fund and its affiliates, as the general partners of Fund V and Fund VI, remained bound to honor fiduciary duties owed to them as limited partners. New Boston Fund did not refute the Bagliones' understanding along this line.

---

[7]The sale was facilitated by a New Boston Fund agent who earned a commission of $135,000.

To induce the Bagliones to enter into the settlement agreement and the TIC agreements, New Boston Fund stated, in no uncertain terms, that the value of the Westborough property was $15,353,333. In October, 2008, some seventeen months after the signing of both the settlement agreement and the TIC agreements, New Boston Fund notified the Bagliones that it was suspending quarterly distributions from Fund VI. The reason, New Boston Fund said, was that the Westborough property would soon be empty, its sole tenant having decided not to renew its triple net lease,[8] which was scheduled to expire in May of 2009. The value of the Westborough property declined precipitously, to the detriment of the Bagliones as tenants in common, and ultimately, the Bagliones lost their entire investment in the Westborough property.

The Bagliones sent a demand letter, see G. L. c. 93A, § 9, to New Boston Fund. Among other assertions, the Bagliones complained of fiduciary wrongdoing by New Boston Fund and demanded that the latter take swift action to make them whole and return them to the status quo ante as they stood before having entered into the settlement agreement. New Boston Fund refused. This lawsuit then followed.

The judge's dismissal order, entered pursuant to rule 12(b)(6), hinged largely on the exculpatory, disclaimer, and merger provisions of the May, 2007, settlement agreement. The pertinent language of those provisions are as follows:

> "1.3 . . . . The Bagliones acknowledge and agree that they will bear all legal, financial and tax costs and risks to them inherent in such distribution transactions and the related Tenant-in-Common Agreement. In addition, the Bagliones acknowledge that, in connection with the foregoing transfer, they have relied on the advice of their own legal and tax experts and not upon any representations made by the New Boston Parties or their agents, representatives or attorneys.
>
> "1.4 The Bagliones acknowledge and agree that the New Boston Parties have made no promises, representa-

---

[8]Typically, a "triple net lease" holds a commercial tenant responsible for all insurance, maintenance, and property related expenses.

tions, or guarantees with respect to the performance, value or any matters relative to the Bagliones' ongoing interest in Fund V or the Two Beneficial Interests."

The settlement agreement contains a mutual release provision, but, for the present case, the release is qualified or otherwise limited by paragraph 3.2, which provides: "Nothing in [the mutual release provision] shall prevent the Parties from asserting or pursuing any claim to enforce the terms of this Agreement." New Boston does not argue or otherwise suggest that the release forecloses the Bagliones' rights to seek relief from the settlement agreement.

A merger provision is set out in paragraph 5.1 of the settlement agreement. It is boilerplate in form and provides: "This document contains the complete agreement between, and contains all of the promises and undertakings of, the Parties. Any and all prior agreements, representations, negotiations and undertakings between the Parties, oral or written, express or implied, with respect to the subject matter hereof are hereby superseded and merged herein."

The settlement agreement specifies that it shall be governed by the laws of this Commonwealth.

b. *Judge's dismissal order.* After having heard the parties on New Boston's motion to dismiss,[9] the judge ruled that, as matter of law, paragraphs 1.3 and 1.4 of the settlement agreement barred the Bagliones' claims.[10,11] The judge did not analyze the long-settled law in this Commonwealth as to the legal effect of such contractual exculpatory, disclaimer, or merger provisions in the context of adequately pleaded fraud claims raised by an aggrieved party and signatory to the contract. The judge con-

---

[9]The appellate record does not contain New Boston's rule 12 motion, any supporting memorandum, or the Bagliones' opposition.

[10]The judge indicated that the merger provision in the settlement agreement lent support for her conclusion along this line.

[11]The Bagliones' counsel had pressed an argument to the judge that the exculpatory provisions in question were void by virtue of the fact that the parties stood in a fiduciary relationship. As discussed below, counsel's argument was overly broad and lacked the guidance needed to aid the judge in the search for the governing legal precepts under our domestic law. As the judge correctly pointed out, such contractual exculpatory provisions are not per se invalid as a matter of public policy in the Commonwealth.

cluded by stating: "[I]n the absence of Massachusetts appellate authority, I decline to extend fiduciary obligations to void exculpatory provisions in a settlement agreement when the party claiming the fiduciary breach has sued the alleged fiduciary."

*Review standard.* Review of the allowance of a rule 12(b)(6) motion is de novo. *Harhen* v. *Brown*, 431 Mass. 838, 845 (2000). For purposes of appraising the legal sufficiency of a complaint under rule 12(b)(6), we accept as true all factual allegations of the complaint and any such reasonable inferences as may be drawn therefrom in the plaintiffs' favor. See *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995); *Golchin* v. *Liberty Mut. Ins. Co.*, 460 Mass. 222, 223 (2011). The ultimate inquiry is whether the plaintiffs alleged such facts, adequately detailed, so as to plausibly suggest an entitlement to relief. *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008).

*Discussion.* New Boston contends that all of the Bagliones' claims are absolutely barred, as matter of law, by virtue of the exculpatory, disclaimer, and merger provisions contained in the settlement agreement. Those claims, New Boston argues, are entirely at odds with the Bagliones' contractual undertakings, which were freely and fully negotiated with the aid of counsel. Among others, New Boston cites *Plumer* v. *Luce*, 310 Mass. 789, 805 (1942); *Masingill* v. *EMC Corp.*, 449 Mass. 532, 542 (2007); and *Turner* v. *Johnson & Johnson*, 809 F.2d 90, 97 (1st Cir. 1986), as controlling precedent for dismissal. New Boston's recital is not only conspicuously incomplete but also a misleading summary of the governing law of our Commonwealth as to the issues at hand.

a. *Deceit claims are adequately pleaded.* Under the law of this Commonwealth, a plaintiff alleging a claim for deceit (i.e., fraud) must show the defendant (1) made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act on this representation, (4) which the plaintiff justifiably relied on as being true, to her detriment. See *Masingill* v. *EMC Corp.*, 449 Mass. at 540; *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 77 (1991). A party to a contract with another cannot claim shelter by a contractual device, such as an exculpatory or merger provision, against

claims of deceit. See *Bates* v. *Southgate*, 308 Mass. 170, 182-
183 (1941); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408
Mass. 704, 712-713 (1990); *Sound Techniques, Inc.* v. *Hoffman*,
50 Mass. App. Ct. 425, 430 (2000). In *Bates*, 308 Mass. at 182,
the Supreme Judicial Court expressed the rationale for this rule
as follows:

> "As a matter of principle it is necessary to weigh the
> advantages of certainty in contractual relations against the
> harm and injustice that result from fraud. In obedience to
> the demands of a larger public policy the law long ago
> abandoned the position that a contract must be held sacred
> regardless of the fraud of one of the parties in procuring it.
> No one advocates a return to outworn conceptions. The
> same public policy that in general sanctions the avoidance
> of a promise obtained by deceit strikes down all attempts
> to circumvent that policy by means of contractual devices.
> In the realm of fact it is entirely possible for a party know-
> ingly to agree that no representations have been made to
> him, while at the same time believing and relying upon
> representations which in fact have been made and in fact
> are false but for which he would not have made the
> agreement. To deny this possibility is to ignore the frequent
> instances in everyday experience where parties accept,
> often without critical examination, and act upon agree-
> ments containing somewhere within their four corners
> exculpatory clauses in one form or another, but where they
> do so, nevertheless, in reliance upon the honesty of sup-
> posed friends, the plausible and disarming statements of
> salesmen, or the customary course of business. To refuse
> relief would result in opening the door to a multitude of
> frauds and in thwarting the general policy of the law."

*Sound Techniques, supra,* followed *Bates* and reaffirmed the
rule that intentional misconduct in the formation of a contract
justifies judicial intrusion in order to prevent the fraudulent ac-
tor from securing contractual benefits procured by deceit, as op-
posed to a claim for negligent misrepresentation where such
intrusion is not warranted. *Bates, supra,* made clear what had
long been the court's objection to the use of clever contractual
devices aimed at shielding a party from liability for fraudulent

290 81 Mass. App. Ct. 282 (2012)

Greenleaf Arms Realty Trust I, LLC *v.* New Boston Fund, Inc.

conduct.[12] See *Granlund* v. *Saraf*, 263 Mass. 76, 79 (1928) ("It is a fundamental principle of law, as it is of morals, public policy and fair dealing, that a party cannot contract against liability for his own fraud"). Similarly, at this very preliminary stage, the merger provision does not have the force that the judge attributed to it. "[F]raud if established is not merged in the contract." *Sandler* v. *Elliott*, 335 Mass. 576, 586 (1957) (citing *Bates*). The Bagliones more than adequately allege in their complaint that they were induced to enter into the settlement agreement and the TIC agreements by New Boston's fraudulent conduct.[13] The judge's allowance of the rule 12 motion was an error of law.

In addition, New Boston contends that the Bagliones' claims cannot be maintained, as matter of law, for lack of reasonable reliance on any alleged misrepresentation made by New Boston. The question whether the Bagliones justifiably relied on the subject representations of New Boston is a question of fact. "Commonly it has been held that the plaintiff is not barred from recovery in deceit, as matter of law, by his failure to examine records which may have revealed the falsity of representations made, and that failure to do so raises a question of fact for the jury." *Sheffer* v. *Rudnick*, 291 Mass. 205, 210-211 (1935).

New Boston also argues that to the extent that the Bagliones have alleged the "value" of the Westborough property was

---

[12]Citing *Cone* v. *Ellis*, 59 Mass. App. Ct. 748, 751-752 (2003), New Boston argues that "an exculpatory clause that is the result of a deliberate, uncoerced, and businesslike process cannot be undone and bars as a matter of law fraud claims based on alleged representations at odds with the provisions of the contract." This principle, however, applies to written contracts "untainted by fraud." *Florimond Realty Co.* v. *Waye*, 268 Mass. 475, 479 (1929). "It is not the policy of the law or of equity to throw obstacles in the way of the proof of fraud affecting the ultimate rights of parties. If that were not so, the great and salutary functions of a court of equity would be unduly limited." *Ibid.*

[13]*Bates* is discussed at length in *Plumer* v. *Luce*, *supra*, and *Turner* v. *Johnson & Johnson*, *supra*; however, it goes unmentioned and uncited by New Boston. Rather than addressing *Bates*, New Boston extravagantly proclaims: "Allowing a fraud claim in the face of multiple clear expressions in a written settlement agreement by a sophisticated plaintiff represented by multiple counsel would sound the death knell to settlements for no defendant could have any assurance of being rid of the potential liability and controversy if the settlement terms ultimately did not suit the plaintiff for one reason or another."

misrepresented by the defendants, their claim fails because (in New Boston's view) the value stated was an opinion and not an actionable misrepresentation of fact. We disagree. It suffices to say that New Boston's representation that the Westborough property had a fair market value in excess of $15 million as of May, 2007, constituted an otherwise unguarded statement fairly suggesting that New Boston had knowledge of such information as to believe the statement to be a true fact. "The representations under consideration were of facts susceptible of knowledge." *Snell* v. *Cohen*, 326 Mass. 40, 42 (1950). As such, it forms the basis of an actionable deceit claim, at this preliminary stage of the case.

b. *Fiduciary claims are adequately pleaded.* It has long been settled in this Commonwealth that general partners owe their limited partners a fiduciary duty of utmost good faith and loyalty no less than that which general partners or stockholders in a close corporation owe one another. See *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 592-593 (1975); *Reeve* v. *Folly Hill Ltd. Partnership*, 36 Mass. App. Ct. 90, 95 (1994). To meet this duty of loyalty, the fiduciary must fully disclose all known material information to the person to whom he owes the duty. "Good faith" demands the fiduciary to make "a full and honest disclosure of all relevant circumstances to permit a disinterested decisionmaker to exercise its informed judgment." *Dynan* v. *Fritz*, 400 Mass. 230, 243 (1987). The Bagliones' complaint adequately alleges, with detail, that New Boston failed to make a full and fair disclosure to them of the material facts bearing on the TIC agreements.

Accepting the facts as alleged to be true, the Bagliones have sufficiently shown that New Boston, despite the adversarial roles in the litigation, had not fairly informed the Bagliones that it disavowed any and all fiduciary obligations to them as limited partners. "The duty accordingly devolved on [New Boston] to disclose to [the Bagliones] . . . any matters of business within the scope of the agreement and mutual understanding, of which the other, not having means of information, was ignorant." *Arnold* v. *Maxwell*, 223 Mass. 47, 49-50 (1916). But even in an arms-length transaction, though there may be no duty otherwise imposed, if a party does speak "to a given point of information,

voluntarily or [otherwise], he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his [or her] knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies." *Kannavos* v. *Annino,* 356 Mass. 42, 48 (1969) (quotation omitted). In the end, the question whether the New Boston general partners owed fiduciary duties to their limited partners, the Bagliones, in this unique context involving a settlement of pending litigation, is a mixed legal and fact-based question that must be addressed on a record in a much more advanced state than the one presently before us on appeal. (New Boston's appellate submissions neither wholly admit nor deny the parties stood in a fiduciary relationship during the negotiation and signing of the settlement agreement and the TIC agreements; the point is left vaguely obscure.)[14]

What is not obscure is that, in all events, New Boston was entrusted with the management of the Bagliones' monies and had custody of the funds during the negotiation of the settlement agreement and thereafter. Exculpatory clauses in trust instruments or other fiduciary-related contracts are enforceable in the Commonwealth. See *Boston Safe Deposit & Trust Co.* v. *Boone,* 21 Mass. App. Ct. 637, 644 (1986); *Steele* v. *Kelley,* 46 Mass. App. Ct. 712, 737 n.24 (1999). Parties to a fiduciary relationship may agree to alter or limit to some degree their fiduciary rights and obligations. See *Fronk* v. *Fowler,* 71 Mass. App. Ct. 502, 507 (2008), *S.C.,* 456 Mass. 317, 330-332 (2010); *Knapp* v. *Neptune Towers Assocs.,* 72 Mass. App. Ct. 502, 507 (2008). Parties may do so in a partnership agreement, by-laws, or other like charter or foundational instrument; however, where the effect of contract language in an agreement that is not of such a charter or foundational character is to eliminate or discard fiduciary obligations wholesale, the law will not so abide.

Accepting as true the well-pleaded factual allegations, as we must, this controversy may be seen as a not uncommon situation where the general and limited partners did not have equal control or access to material information as to the proposed tenant-in-

---

[14]Having elected not to file an answer, New Boston cannot now say as a matter of fact that no such relationship existed at the time the settlement agreement was concluded.

common properties. Settled concepts of fiduciary law are particularly apt and explain why the present controversy is distinguishable from the "workaday world" of those acting at arm's length. *Meinhard* v. *Salmon*, 249 N.Y. 458, 464 (1928). As do the shareholders in a close corporation, partners in a limited or general partnership owe one another the duties of utmost loyalty, trust, and confidence. See *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952); *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. at 593. "As a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain." *Meehan* v. *Shaughnessy*, 404 Mass. 419, 434 (1989).

The Bagliones' remaining pending claims are best left for the parties to address at a later stage in this action.

*New Boston's cross appeal.* It suffices to say that New Boston's rule 11 motion was baseless and correctly denied by the judge. Simply put, given our disposition of the Bagliones' appeal, any request for rule 11 relief is absolutely foreclosed. See *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 416 (1998).[15]

*Conclusion.* The order allowing New Boston's motion to dismiss is reversed, and the case is remanded to the Superior Court for further proceedings. The order denying New Boston's rule 11 motion is affirmed.

*So ordered.*

---

[15]The Bagliones' request for appellate costs and attorney's fees on the rule 11 issue is denied.