Kenton-Walker, Janet, J.
*679 INTRODUCTION
The plaintiff homeowner, Kenneth E. Silman (Sil-man), seeks relief against his mortgage broker, Ann M. Sabbagh (Sabbagh), and Wells Fargo Bank, N.A. (Wells Fargo), the successor to his mortgage lender, Wachovia Mortgage, FSB (Wachovia), for alleged improprieties during the loan origination, the loan modification process, and the initiation of foreclosure. Silman’s amended complaint alleges seven causes of action against each defendant: (1) breach of the implied covenant of good faith and fair dealing; (2) violation of G.L.c. 93A; (3) violation of truth in lending; (4) breach of contract; (5) negligent misrepresentation; (6) fraud; and (7) intentional infliction of emotional distress. In an earlier order, the court dismissed all claims against Wells Fargo except the fraud and violation of G.L.c. 93A claims, so far as they alleged that Wells Fargo wrongfully sought foreclosure while the plaintiff was being reconsidered for a loan modification under the Home Affordable Modification Program (HAMP). Now before the court is Defendant Wells Fargo’s Motion for Summary Judgment on the remaining claims, and Defendant Sabbagh’s Motion for Summary Judgment on all of the counts against her. For the following reasons, Sabbagh’s Motion for Summary Judgment is ALLOWED in part and DENIED in part, and Wells Fargo’s Motion for Summary Judgment is DENIED.
BACKGROUND
The following facts are the undisputed facts contained in the summary judgment record, viewed in the light most favorable to the non-moving party.
I. Facts Pertaining to Sabbagh
Silman is self-employed as a bookkeeper and accountant. Silman conducts his business under the name KDS Resources, which is a sole proprietorship. Silman has a master’s degree in accounting. Silman is not a certified public accountant (CPA).
In December 2007, Silman began working with Sabbagh, a mortgage broker with Seacoast Mortgage Corporation (Seacoast), to obtain financing to purchase a residence located at 19 Westland Street, Worcester, MA. Sabbagh and Seacoast act solely as mortgage brokers, assisting borrowers in finding a mortgage from third-party lenders. Sabbath and Seacoast are not lenders. Silman understood that Sabbagh was acting as mortgage broker, not a lender.
At the time of his involvement with Sabbagh, Sil-man understood the difference between a stated income and a full documentation loan. With a stated income loan, also referred to as a quick qualifying or NIV loan (no income verification), a borrower merely states his or her monthly income on the loan application. The lender does not require income verification, however, the borrower’s income must be commensurate with the type of employment. Prior to contacting Sabbagh, Silman worked with several brokers from other companies to obtain financing. These brokers submitted loan applications for Silman, but they were unable to obtain financing for him. Silman gained knowledge of the types of loans available through his involvement with these other brokers.
Silman signed three Uniform Residential Loan Applications that Seacoast provided to him. Sabbagh filled out the loan applications, and thereafter, Silman initialed each page and signed the applications. Sil-man did not read or review the loan applications before signing the documents. The loan applications contain a number of misstatements regarding Silman’s income and assets. Two of the loan applications (Sabbagh Jt. Appx. 8-9), both undated, reflect Silman’s monthly income from employment as $15,330. The third loan application (Sabbagh Jt. Appx. 10), dated December 14, 2007, reflects Silman’s monthly employment income as $17,000. Silman testified at his deposition that at the time of the third loan application, his monthly income was “not even close” to $17,000 (Depo. p. 68), and that both the $15,330 and the $17,000 income figures are “highly inflated.” (Depo. p. 99.) Silman’s tax return for 2006 shows an income of $64,420 and his 2007 return shows an income of $84,854.
The two undated loan applications state that Sil-man has $135,000 in liquid assets. The third loan application states that Silman has $145,400 in liquid assets. Silman testified that his liquid assets only “approached $75,000.” (Depo. p. 65.) The loan applications all wrongly state that Silman is a CPA. Above the signature line on the applications it states “the information provided in this application is true and accurate as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability ...”
Each loan application also reflects $1,375 rental income for a residence at 71 Gold Mine Road, Dublin, N.H. Silman lived in this New Hampshire properly prior to acquiring the Worcester property at issue in this action. In the record is a lease dated November 5, 2007, between Silman and Jason Michaels for the Dublin property for $1,375. (Jt. Appx. 4.) Silman testified however, that the lease fell through and the tenant never moved in and he never received rental income from this tenant.[2] Silman provided a copy of the lease to Seacoast.
Sabbagh placed the third loan application with two lenders: Bank United and Wachovia. Both lenders processed the loan as a stated income loan. Wachovia accepted the application and approved Silman for a $303,200 loan. The closing on the property occurred on January 9,2008. The mortgage that Silman entered is a so-called “Pick-a-Payment Equity Builder Loan.” The mortgage is an adjustable rate mortgage with an initial interest rate of 7.85% for the first year of the loan. Thereafter, the interest rate would adjust yearly depending on prevailing interest rates. Silman’s initial *680 payment was $618.90 bi-weekly. If the required biweekly payments do not cover the interest due on the loan, and the borrower only makes the minimum payment, the unpaid interest is capitalized. The loan has a principal balance cap of 125% of the original loan balance. If the balance cap is reached, payments are increased to an amount sufficient to repay the loan in full on its maturity date.
Sabbagh never met Silman in person during the loan application process. Silman and Sabbagh communicated on the telephone and by e-mail. For the “Pick-a-Payment” loan, the only information that Wachovia required verification of was Silman’s assets. In this regard, Sabbagh avers that she reviewed two months of statements from Silman’s bank and retirement accounts. On December 14, 2007, Alan Swider, a Seacoast employee, sent Silman an email requesting documents required for his loan application. Swider requested two months of bank and retirements accounts, a document demonstrating that the broker’s deposit cleared his account, a letter from “CPA” stating your length of self-employment, and a copy of his driver’s license. Silman does not dispute that he sent all of these items, but avers that he also sent Seacoast copies of his tax returns for 2006 and 2007, profit and loss statements, and 1099 tax forms from his clients. Silman cannot document that he sent these additional documents to Seacoast. (Depo. 117.) Sabbagh avers that Seacoast has no record of receiving any verification documents from Silman besides the ones that Alan Swider requested in the December 14, 2007 e-mail. Silman avers that he believed that the loan that Wachovia was providing was a full documentation loan because Sabbagh required him to provide this tax information. Sabbagh testifies that she explained the difference between a stated income and a full documentation loan to Silman.
Prior to the loan closing, on December 14, 2007, Sabbagh required Silman to sign a number of disclosure agreements. On December 14, 2007, Silman signed a document titled “Mortgage Broker Fee Agreement and Disclosure” (Mortgage Broker Fee Agreement). (Sabbagh Jt. Appx. 11.) The Broker Fee Agreement states: “You [meaning Silmanl acknowledge that the lender will be relying on your statements contained in this agreement and in your application.” Silman did not read the Broker Fee Agreement before he signed it. On December 14, 2007, Silman also signed a copy of the mortgage broker disclosures required by the Massachusetts Attorney General’s Consumer Protection Regulations (AG Disclosures Form). (Sabbagh Jt. Appx. 13.) The AG Disclosures Form indicates that Seacoast will take information from Silman and fill out his loan application, analyze his income and debt to determine the maximum debt that he can afford, collect financial information and other related documents from him that are part of the application process, and initiate and order appraisals. Parts of the disclosure are incomplete; the interest rate, payment amounts, and fees are blank. Silman testified that he reviewed this disclosure before he signed it.
Silman also signed a document titled “Zero Tolerance Loan Fraud Agreement” (Zero Tolerance Agreement). (Sabbagh Jt. Appx. 14.) This Zero Tolerance Agreement states:
Foreclosure and other serious consequences are likely to occur when a loan is based on fraudulent information or process. The mortgage broker or lender will take certain steps to review the loan origination, submission and closing practices to attempt to ensure that loan fraud has not occurred. Most importantly, for the benefit of the consumer, it is critical to ensure that each loan is properly originated, processed and closed so that your financial and home ownership goals are achieved.
The secondary market has developed many reduced documentation mortgage loans such as stated income loans, NINA (no income, no asset) information loans, NIV (no income verification) loans, no ratio loans, and low and no documentation loans. These loan programs may be more expensive than a fully documented loan program and are intended to assist borrowers who may not be willing or able to qualify for, or document the information required in, a fully documented loan, but do have sufficient and valid income, asset, employment and other attributes required in a reduced documentation program. Please understand that although the reduced documentation loans may require less information or verification, loan fraud can still occur. You should carefully review and consider the loan program and product that is best for you and never engage in, or allow, a misstatement of your information to occur when applying for a loan.
The Zero Tolerance Agreement goes on to identify what constitutes fraud and the potential consequences of mortgage fraud. Immediately above the signature line the document states:
I understand that the mortgage broker and lender are rendering services and making the subject loan(s) in consideration of the representations herein and I do hereby confirm that all statements made by me, including those set forth in this form and all statements made in the loan application and closing process are complete, truthful and accurate.
Silman reviewed the Zero Tolerance Agreement before signing it.
In his affidavit (Sabbagh Jt. Appx. 25), Silman avers that Sabbagh represented to him that he could afford the Wachovia loan if he could put down a 20% deposit. Silman liquidated his retirement account and life savings to come up with the down payment. Silman testifies that Sabbagh told him that he could easily obtain a second mortgage to recoup the down payment *681 he made. Silman also states that Sabbagh informed him that he would be able to refinance to a traditional fixed interest rate loan after three years. Silman testifies that he relied upon these representations in entering the loan. Silman avers that he did not discover that his income was misstated until “sometime after the closing” when he reviewed the mortgage application and closing documents.
Silman sent two e-mails (Sabbagh Jt. Appx. 18-19) to Sabbagh prior to the closing regarding his ability to borrow against the 20% down payment that Wachovia required. In a January 3, 2008 email, Silman states:
Ann, FYI . . . The “Pick-a-Pay” program has killed any chance that I can get a HELOC [Home Equity Line of Credit], as no lender will provide a line of credit on a product that has a negative amortization option . . . this just keeps getting better by the minute . . . Ken.
In January 7, 2008 email, Silman states:
Hi Ann, Well, here is the latest problem . . . Given that all the rules have recently changed, NO lender will issue a line of credit now matter how small on an Option Arm Program . . . Guess I am going to be house poor for a long time to come . . . Ken.
No response emails from Sabbagh are contained in the record.
Sabbagh avers that prior to the closing, she explained to Silman that given the type of mortgage he obtained, he would likely be unable to qualify for a second mortgage or line of credit on the property. (Sabbagh Aff. para. 20.) Sabbagh testifies that she never promised him that he would be able to refinance. Sabbagh testifies that she explained that one option could be refinancing to a fixed 30-year rate during years 4-7 of the loan.
II. Facts Pertaining to Wells Fargo
Wells Fargo is the successor to Wachovia Mortgage, FSB, which issued the Pick-a-Payment loan to Silman on January 9, 2008. Wachovia was a Federal Savings Bank chartered with the Office of Thrift Supervision within the United States Department of Treasury.
In November 2008, Silman ceased making mortgage payments. On December 26, 2008, Wachovia notified Silman that there were presently $3,563.31 in payments past due. On January 1, 2009, Wachovia merged with Wells Fargo.[3]
On January 13, 2009, Wells Fargo notified Silman that he was in default, with a total delinquency of $4,455.03, and that if he did not cure his default by April 13, 2009, it could accelerate the debt and terminate his ownership by foreclosure.
On April 13, 2009, Wells Fargo sent Silman a Pre-Foreclosure Reinstatement Quote, which notified Silman that his loan “has been approved for commencement of foreclosure action which may cause you to lose your property and any owner’s equity.” (Dolan Aff. Ex. 8.) The document states that Silman can resolve the delinquency by paying the full delinquent amount, $10,042.96, by April 25,2009. The document also states that Silman can contact Wells Fargo immediately to discuss assistance options. Thereafter, Sil-man contacted Wells Fargo regarding its Mortgage Assistance Plan (MAP). MAP is a loan assistance program run by Wells Fargo that is independent of HAMP. On May 15, 2009, Wells Fargo agreed to modify Silman’s loan and provided a proposed modification agreement. Silman rejected the terms of the modification agreement and sent his own proposed terms in a letter dated May 17, 2009. In a June 2, 2009 letter, an attorney for Wells Fargo rejected Silman’s proposed terms and extended the previous offer through June 12, 2009. Silman did not accept the modification.
By letter dated July 7, 2009, Wells Fargo’s foreclosure counsel notified Silman that Wells Fargo would be proceeding with foreclosure if it did not receive notification from Silman that he disputed the debt within thirty days. On August 19, 2009, Silman filed a Chapter 13 voluntary petition in the Worcester location of the United States Bankruptcy Court for the District of Massachusetts. The bankruptcy filing can-celled the pending foreclosure sale. Thereafter, Silman voluntarily dismissed the bankruptcy action on December 14, 2009.
Silman received assistance from a number of organizations and private attorneys to try to obtain a loan modification, including Neighborhood Assistance Corporation of America and Urban Edge. On January 22, 2010, Katie Clay of Urban Edge sent a letter on Silman’s behalf to Wells Fargo requesting a loan modification. In March 2010, Wells Fargo received a HAMP Hardship Affidavit and supporting documentation on Silman’s behalf. It is unclear from the record which organization or attorney submitted this documentation for Silman. On April 8, 2010, Wells Fargo notified Silman by letter that it had made a final decision on his eligibility for a HAMP modification. The letter states that Silman is ineligible because Wells Fargo is “unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your loan beyond the requirements of the program.” (Dolan Aff. Ex. 14.) Upon receiving this letter, Silman understood that a loan modification would never be approved and that foreclosure would proceed.
On May 18, 2010, Wells Fargo sent Silman a notice of foreclosure stating that the property would be sold at public auction on June 22, 2010. On June 21,2010, Silman filed for bankruptcy again and Wells Fargo postponed the foreclosure. Silman voluntarily dismissed the bankruptcy action on March 15, 2011.
In a letter dated July 9, 2010, Wells Fargo acknowledged that it had received loan modification documents on multiple occasions, but confirmed its position that Silman’s financial situation does not *682 support a loan modification. Silman understood from this letter that Well Fargo would no longer participate in the loan modification process, that it believed that he did not qualify for a modification, and that there was no longer was a loan modification pending at that time. (Silman Depo. 228.) In a July 27, 2010 letter, counsel for Wells Fargo reiterated this position to Silman.
Around January 2011, Silman corresponded with employees from the Home Preservation Office of the United States Treasury Department. Thereafter, Sil-man filed a complaint with the HAMP Solution Center. Wells Fargo sent a letter dated April 13, 2011, confirming receipt of his complaint filed with the HAMP Solution Center. The letter states: “A resolution will be provided to you as well as HSC once the appropriate research has been completed by May 12, 2011.” (Sil-man Aff. Attachment B.)
On May 4, 2011, Wells Fargo’s foreclosure counsel sent Silman a notice of foreclosure by public auction on June 8, 2011. On May 12, 2011, Wells Fargo’s foreclosure counsel sent Silman’s attorney a letter in response to a FedEx package that foreclosure counsel received from Silman, that foreclosure counsel characterized as threatening. In this letter, counsel states that the “foreclosure sale is scheduled for June 8, 2011.” (Dolan Aff. Ex. 20.)
On June 1, 2011, Wells Fargo executed a document titled “CERTIFICATION.” The Certification states that it is made in accordance with HAMP and supplemental directive 10-02. The document states, among other things, that Wells Fargo had previously reviewed Silman’s loan application in accordance with HAMP and Silman was found to be ineligible, all available loss mitigation alternatives had been exhausted, and a non-foreclosure outcome could not be reached.
On June 7, 2011, Silman filed for bankruptcy protection for the third time in the Worcester Bankruptcy court. The June 8, 2011 scheduled foreclosure was postponed because of the bankruptcy filing. Silman filed a notice of voluntary dismissal on November 1, 2011. No additional requests for a loan modification were made to Wells Fargo. On December 7, 2011, Silman commenced this action. On December 20, 2011, the court issued a temporary restraining order precluding Wells Fargo from foreclosing on Silman’s property. Silman continues to live at the property.
DISCUSSION
Sabbagh and Wells Fargo’s motions for summary judgment are now before the court.
I. Summary Judgment Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). A party seeking summary judgment may satisfy its burden of demonstrating the absence of triable issues either by submitting affirmative evidence demonstrating entitlement to relief, or the opposing party’s lack of entitlement, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of their case. Flesner v. Tech. Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass, at 716. Once the moving party establishes the absence of a triable issue, the nonmoving party must respond by setting forth specific facts showing that there is a genuine issue for trial. Mass.R.Civ.P. 56(e); Kourouvacilis, 410 Mass, at 716. A party cannot defeat a motion for summary judgment by resting on his or her pleadings and making mere assertions of disputed facts. Lalonde v. Eissner, 405 Mass. 207, 209 (1989).
II. Sabbagh’s Motion for Summary Judgment
Sabbagh moves for summary judgment on each of the claims that Silman brings against her: (1) breach of the implied covenant of good faith and fair dealing; (2) violation of G.L.c. 93A; (3) violation of truth in lending; (4) breach of contract; (5) negligent misrepresentation; (6) fraud; and (7) intentional infliction of emotional distress.
A. Breach of Contract/Covenant of Good Faith and Fair Dealing
Sabbagh contends that she is entitled to summary judgment because she did not have a contractual obligation to verify income information contained in Silman’s loan application other than to provide the completed application to Silman for his review and execution. Silman contends that the AG Disclosures Form and the Zero Tolerance Agreement create a contractual obligation that Sabbagh breached.
Whether a contract exists is typically a question of fact, that cannot be resolved on summary judgment. See Jackson v. Action for Boston Community Dev., 403 Mass. 8, 9-10 (1988). Here there is a genuine question of material as to whether the documents in the record contractually obligated Sabbagh to accurately state and verify Silman’s income. Sabbagh points to the language from the Mortgage Broker Fee Agreement quoted above in support of her position that she had no obligation to verify Silman’s income. The Mortgage Broker Fee Agreement states that Silman acknowledges that the lender will be relying on statements in the loan application. The AG Disclosures Form states that Sabbagh will analyze Silman’s income and debt to determine the maximum debt that he can afford and collect financial information and other related documents from him that are part of the application process. The Zero Tolerance Agreement states in pertinent part, “the mortgage broker or lender will take certain steps to review the loan origination, submission and closing practices to attempt to ensure that loan fraud has not occurred.” These documents, along with the other evidence in the record, are sufficient to create a genuine issue of material fact as to whether Sabbagh had a contractual obligation to verify the *683 information in Silman’s loan application, and if so, whether Sabbagh breached such an obligation.
Sabbagh also argues that Silman’s covenant of good faith and fair dealing claim should be dismissed. A covenant of good faith and fair dealing is implied in every contract. UNO Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). The covenant prohibits a party to a contract from injuring the rights of another contracting party to “reap the benefits prescribed by the terms of the contract.” Id. The covenant does not “create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Id. ‘The essential inquiry is whether the challenged conduct conformed to the parties’ reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance.” Speakman v. Allmerica Fin. Life Ins., 367 F.Sup.2d 122, 132 (D.Mass. 2005) (Saylor, J.).
Silman contends that Sabbagh intentionally misstated his income. If a factfinder were to find that Sabbagh had a contractual obligation to verify Silman’s income, the factfinder could also find that Sabbagh breached the duty of good faith and fair dealing by intentionally misstating his income. See Smith v. Jenkins, 718F.Sup.2d 155, 170-71 (D.Mass. 2010) (Stearns, J.) (“covenant claims depend upon the survival of the contract claims, and are merely elements to be considered in assessing the gravity of any breach . . .”).
B. Violation of Truth in Lending
Silman’s amended complaint alleges that the defendants violated Truth in Lending.” The amended complaint does not specify whether this claim is pursuant to the Massachusetts Truth in Lending Act, G.L.c. 140D, or the Federal Truth in Lending Act, 15 U.S.C. §1601 et seq. Nonetheless, the requirements of both acts are only applicable to “creditors” as defined by the Acts. G.L.c. 140D, §1 defines “Creditor” as:
a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.
Sabbagh moves for summary judgment on this claim contending that she is not a creditor, and therefore, is not subject to the requirements of the Truth in Lending Acts. The court agrees. The undisputed evidence is that Sabbagh was acting as a mortgage broker alone, not a lender, and was not an agent of Wachovia/Wells Fargo. Furthermore, Silman brings no argument in his opposition brief as to why Sabbagh is not entitled to judgment as a matter of law on this claim. Accordingly, summary judgment will be allowed on this claim.
C. Intentional/Negligent Misrepresentation
Sabbagh moves for summary judgment on the fraud claim contending that she was unaware that Silman’s loan application contained false information[4] and that Silman’s reliance on the false information was unreasonable as a matter of law.
In Massachusetts the elements of deceit, the tort for intentional misrepresentation, are (1) a misrepresentation as to a matter of fact; (2) made with the intention to induce another to act upon it; and (3) reasonable reliance upon the representation to the detriment of the relying party. Twin Fires Inv., LLC v. Morgan Stanley, 445 Mass. 411,423 (2005). Negligent misrepresentation, on the other hand, requires proof that the defendant (1) in the course of business; (2) supplied false information for the guidance of others; (3) that justifiably relied upon the representation to their detriment; and (4) the defendant failed to exercise reasonable care in obtaining or communicating the information. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59 n.25 (2004). Both of these claims require reasonable reliance by the plaintiff to prevail.
Usually the reasonableness of reliance is a question of fact, which cannot be resolved on summary judgment. See Greehleaf Arms Realty Trust I, LLC v. New Boston Fund, Inc., 81 Mass.App.Ct. 282, 290 (2012). Nonetheless, Sabbagh contends that the court should find any reliance on Silman’s part as to the contents of the loan application unreasonable as a matter of law, citing Smith u. Jenkins, 718 F.Sup.2d 155, 167 (D.Mass. 2010) (Stearns, J.) (allowing summary judgment on a borrower’s claim of misrepresentation against her mortgage broker). Id. at 167. In Smith v. Jenkins, the borrower signed a loan application that contained materially false income information entered by the broker. Id. at 166. The court concluded that borrower’s reliance was unreasonable as a matter of law because the borrower did not make even a cursory examination of the document she was signing, which would have revealed the patently false representations. Id. at 167.
However, even if Sabbagh is correct that Silman’s reliance on the representations in the loan application would be unreasonable as a matter of law, there still remains another representation contained in the amended complaint that the court must evaluate, Sabbagh’s alleged representation that Silman would be able to refinance the property eventually. The affidavits in the summary judgment record conflict as to exactly what Sabbagh communicated to Silman regarding refinancing options. There remains genuine *684 issues of material fact as to whether Sabbagh promised Silman he would be able to refinance, and if so, whether Sabbagh acted intentionally or negligently when making the representation, whether such representation was untrue, whether Silman relied upon this representation, and whether such reliance was reasonable/justified. See Thelemaque v. Fremont Inv. & Loan, 2011 Mass.Super. LEXIS 98 at *16-17 (2011) (Lauriat, J.) [28 Mass. L. Rptr. 430] (finding jury issue as to fraud where borrower averred that mortgage broker promised that borrower could refinance within six months); see also Celluci v. Sun Oil Co., 14 722, 730 (1974) (“Although as a general rule representations as to future events are not actionable, an exception has been recognized where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate”). Accordingly, summary judgment will be denied on these claims.
D. Violation of G.L.c. 93A
Sabbagh moves for summary judgment on Silman’s G.L.c. 93A claim against her arguing that Silman will be unable to establish that Silman’s reliance on false statements in his loan application was unreasonable given Silman’s sophistication, knowledge, and opportunities to review the application. Regardless of whether Silman’s reliance on the contents of the loan application was unreasonable as a matter of law, there nonetheless remains other grounds from which a jury could conclude that Sabbagh’s conduct was unfair or deceptive pursuant to G.L.c. 93A. First, as mentioned immediately above, there is a genuine issue of material fact as to whether Sabbagh misrepresented Silman’s ability to refinance. If a jury finds that Sabbagh made this misrepresentation intentionally, the jury could also conclude that this conduct was an unfair or deceptive practice.
Second, if a mortgage broker submits a loan application with an inflated income without the borrower’s knowledge or permission, a jury could find that this conduct violates Chapter 93A, even if the borrower should have known of the misrepresentation. See Thelemaque, 2011 Mass.Super. LEXIS 98 at *13.
Third, there is a genuine issue of material fact as to whether Sabbagh violated the Massachusetts Attorney General’s regulations concerning mortgage brokers, 940 Code Mass.Regs. §8.00 et seq. (effective Jan. 2, 2008). Section 15 declares it an unfair or deceptive act or practice under G.L.c. 93A for a mortgage broker to:
arrange ... a mortgage loan unless the mortgage broker .. . based on information known at the time the loan is made, reasonably believes at the time the loan is expected to be made that the borrower will be able to repay the loan based upon a consideration of the borrower’s income, assets, obligations, employment status, credit history, and financial resources, not limited to the borrower’s equity in the dwelling which secures repayment of the loan.
Section 16 declares it an unfair or deceptive practice for a mortgage broker to:
process or make a mortgage loan on a no- or limited documentation basis if the stated income provided by the borrower with respect to the no- or limited documentation loan contradicts information previously obtained by the broker or lender with respect to that borrower in connection with the same proposed loan, absent a documented change in circumstances or other documented explanation for the discrepancy between the prior information and latter income representation.
Issues of material fact remain as to whether Sabbagh violated these provisions. Accordingly, summary judgment shall be denied as to the Chapter 93A claim against Sabbagh.
E. Intentional Infliction of Emotional Distress
To prove intentional infliction of emotional distress (IIED), a plaintiff must establish that: (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of their conduct; (2) the defendant’s conduct was “extreme and outrageous,” “beyond all possible bounds of decency,” and “utterly intolerable in a civilized community”; (3) the defendant’s conduct caused the plaintiff emotional distress; and (4) the emotional distress was “severe.” Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).
The court agrees with Sabbagh that summary judgment should be allowed on Silman’s IIED claim because Silman has proffered no evidence of conduct by Sabbagh that is “extreme and outrageous.” See Powell v. Ocwen Loan Servicing, 2012 WL 345665 (Mass.Super. 2012) (Hines, J.) (finding conduct not extreme and outrageous where mortgage broker inflated borrower’s income on loan application); Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034 (9th Cir. 2011) (holding conduct not extreme and outrageous where plaintiffs allege lenders offered loans knowing borrower could not repay). For conduct to be “outrageous” with regard to an IIED claim there must be “a high order of reckless ruthlessness or deliberate malevolence that is . . . simply intolerable.” Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994). Silman’s allegations against Sabbagh do not rise to the level of opprobrious conduct that courts have found to be extreme and outrageous. Cf. Simon v. Solomon, 385 Mass. 91, 96-97 (1982) (landlord’s indifference to repeated flooding of raw sewage into tenant’s apartment); Agis, 371 Mass, at 145 (public humiliation). Therefore, Sabbagh’s motion for summary judgment must be allowed as to the IIED claim.
III. Wells Fargo’s Motion for Summary Judgment
Wells Fargo moves for summary judgment on the remaining claims against it, fraud and violation of *685 G.L.c. 93A claims for allegedly seeking foreclosure while the plaintiff was being reconsidered for a loan modification under HAMP. Wells Fargo contends that it is entitled to summary judgment because it did not proceed with a foreclosure until Silman had been evaluated for HAMP and determined to be ineligible.
Alvarez v. U.S. Bank N.A., 2012 U.S. Dist. LEXIS 86678 at *6-8 (D.Mass.) (Saylor, J.) (internal citations omitted), provides a instructive summary of the HAMP program:
In February 2009, the Secretary of the Treasury established HAMP . . . The goal of HAMP is to provide relief to borrowers who have defaulted or are likely to default by reducing mortgage payments to sustainable levels, -without discharging any of the underlying debt. Under HAMP, loan servicers are provided with $1,000 incentive payments for each permanent mortgage-loan modification completed. These modifications proceed under a uniform process designed to identify eligible borrowers and render their debt obligations more affordable and sustainable.
The Department of the Treasury has issued a series of directives that provide guidance to servicers implementing HAMP . . . Under these guidelines, mortgage servicers are directed to identify and solicit borrowers who are in default on their mortgage payments, or soon will be . . . Within this group, borrowers may be eligible for a loan modification under HAMP if the mortgage loan originated before January 1, 2009; if the mortgage is secured by the borrower’s primary residence; and if the mortgage payments amount to more than 31% of the borrower’s monthly income ... To participate in HAMP, borrowers must submit an affidavit documenting financial hardship ... In addition, the servicer must conduct a Net Present Value (“NPV”) test, which assesses whether it would be more advantageous to foreclose or to modify the terms of the first-lien loan.
HAMP guidelines permit a borrower whose loan servicer has determined him/her to be ineligible for HAMP to “escalate” the case. See Making Home Affordable Program, HANDBOOK FOR SERVICERS OFNON-GSE MORTGAGES (Version 3.0, Dec. 2, 2010), https://www.hmpadmin.com/ / portal/ programs/d ocs/hamp_servicer/mhahandbook_30.pdf [hereinafter HAMP HANDBOOK], Case escalation requires the loan servicer to take a second look at a borrower’s eligibility for HAMP. Specifically, “the servicer must review each Escalated Case received from a Requestor against the information and documentation in the servicing system and/or mortgage file and data reported to the HAMP Reporting Tool to determine the accuracy of the inquiry and reach a resolution. As necessary, the servicer’s evaluation will include, but is not limited to, review or recalculation of the HAMP modification waterfalls and NPV testing.” HAMP HANDBOOK, supra at 38. HAMP Solution Center (HSC) is a resolution resource established by the Treasury Department that manages escalated cases received from government offices and third parties acting on behalf of borrowers. HAMP HANDBOOK, supra at 36. HSC personnel evaluate the circumstances and status of a borrower’s escalated case and work with the servicer to resolve the case in a manner consistent with program guidelines. HAMP HANDBOOK, supra at 37. An escalated case is resolved when the servicer:
Determines that there is no change in the original determination or identifies a proposed resolution that corresponds to one of the Resolution Categories listed below;
Documents the proposed resolution in the servicing system and/or mortgage file including a date the resolution was reached;
Within 10 business days of identifying the proposed resolution, communicates in writing to the Re-questor and, as applicable, the borrower, the proposed resolution and next steps (if applicable, this communication may be a TPP Notice, Modification Agreement or short sale or deed-in-lieu agreement); and
Takes the first action to implement the resolution. HAMP HANDBOOK, supra at 38.
Silman contends that Wells Fargo violated the HAMP guidelines by referring his loan to foreclosure on May 4, 2011, while his case escalation was still pending. On April 13, 2011, Wells Fargo confirmed receipt of Silman’s complaint filed with the HAMP Solution Center. The confirmation letter states that Silman will be provided a resolution by May 12, 2011. Silman did not receive a proposed resolution during this time period, or any communication stating that his escalated case was resolved.
Wells Fargo argues that even if it did make a foreclosure referral while Silman’s escalated case remained unresolved, this conduct would not violate the HAMP requirements. The court disagrees; referring a case to foreclosure while a case escalation is pending is prohibited under HAMP. Chapter II, Section 3 of the HAMP HANDBOOK is titled “Protections Against Unnecessary Foreclosure.” Section 3.1 states:
3.1 Suspension of a Referral to Foreclosure
A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:
The borrower is evaluated for HAMP and is determined to be ineligible for the program; or
The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or
The servicer has established Right Parly Contact, has sent at least two written requests asking the *686 borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or
The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or
The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.
The servicer has resolved the Escalated Case in accordance with Section 3.3 of Chapter I.
The court reads this language to mean that all of the above circumstances that are applicable must be satisfied before a referral to foreclosure is made. Thus, if a borrower has escalated the case, the escalated case must be resolved before a foreclosure referral is made. This interpretation is consistent with the stated purpose of Section 3, which is to prevent unnecessary foreclosure. See Herman v. Admit One Ticket Agency, LLC, 454 Mass. 611, 618 (2009} (title of document or statute useful tool in language interpretation}. Furthermore, there would be little point served in requiring servicers to engage in the case escalation process, if they could foreclose while the escalated case was unresolved. See Cadle Co. v. Vargas, 55 Mass.App.Ct. 361, 366 (2002) (language of text should not be interpreted to create an absurd result). Indeed, subsequent versions of the Hamp Handbook have made this explicit. See Making Home Affordable Program, Handbook For Servicers of Non-GSE Mortgages, 62 (Version 4.3, Sept. 16, 2013), https://www.hmpadmin.com/ /portal/programs/docs/ hamp_servicer/mhahandbook_43.pdf (“A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale . . . unless and until the servicer has resolved the Escalated Case . ..”}.
Wells Fargo argues that it was under no obligation to suspend foreclosure referrals once it had initially determined that he was ineligible for HAMP. Wells Fargo cites to Alvarez v. U.S. Bank N.A., 2012 U.S. Dist. LEXIS 86678 (D Mass.), in support of its argument. In Alvarez, the court found that a borrower failed to plead a violation of HAMP where the borrower alleged that the loan servicer foreclosed on him while his second HAMP application was unresolved. 2012 U.S. Dist. LEXIS 86678 at *12. After the borrower’s first application was denied, he reapplied. Id. The court found that the servicer did not violate HAMP Supplemental Directive 09-01, which states “servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program,” because the initial denial was sufficient to meet the Supplemental Directive’s mandate. Id. Wells Fargo argues that this same reasoning is applicable to its own conduct. This argument is unavailing because the HAMP Supplemental Directives supplements the requirements of the HAMP Handbooks. See Making Home Affordable, Supplemental Directive 13-12, 1 (Dec. 10, 2013), https://www.hmpadmin.com/por-tal/programs/docs/hamp_servicer/sdl 312.pdf (describing difference between Handbook and Directives). Thus, action that is not required by a Supplement Directive may nonetheless be required by the HAMP Handbook. As discussed above, the HAMP Handbook applicable at the time of Wells Fargo’s final notice of foreclosure prohibited referral to foreclosure while an escalated case was unresolved.
However, upon review of the documents in the summary judgment record, the court cannot say as a matter of undisputed fact that Silman’s escalated case was unresolved at the time Wells Fargo noticed the foreclosure. If a factfinder was to determine that Silman’s escalated case was pending at the time the foreclosure notice was issued, this conduct could form the basis for a G.L.c. 93A claim. See Alvarez, 2012U.S. Dist. LEXIS 86678 at *11. To establish that a violation of the HAMP requirements also constitutes a violation of G.L.c. 93A, the borrower must prove that the violation consists of conduct that would be independently actionable under Chapter 93A, and that recovery under Chapter 93A is consistent with the objectives and enforcement mechanisms of HAMP. See id., citing Morris v. BAC Home Loans Servicing, L.P., 775 F.Sup.2d 255, 259 (D.Mass. 2011). Assuming, that Wells Fargo violated HAMP, questions of material fact remain as to the other elements of this claim. Another remaining potential basis for G.L.c. 93A recovery is premised on Wells Fargo’s representation contained in its April 13, 2011 letter stating that Silman’s escalated case was being evaluated. See Stagikas v. Saxon Mtge. Servs., Inc., 2013 U.S. Dist. LEXIS 136462 at *12-13 (D.Mass. 2013) (Hillman, J.) (misrepresentations regarding status of HAMP application actionable under Chapter 93A). Accordingly, Wells Fargo’s Motion for Summary Judgment must be denied.
ORDER
For the foregoing reasons, Sabbagh’s Motion for Summary Judgment is ALLOWED as to Silman’s Truth in Lending and intentional infliction of emotional distress claims against her, and DENIED as to the remaining counts; Wells Fargo’s Motion for Summary Judgment is DENIED.

N'his property was foreclosed upon subsequent to the closing on the loan on the Westland St. property.

For simplicity’s sake, from herein the court will refer to the merged entity simply as Wells Fargo. The court recognizes that correspondence between servicer and Silman continued under the name Wachovia for some time after the merger.

The court disagrees that Sabbagh was unaware that Silman’s loan application contained false information—this remains a genuine issue of material fact. Silman’s testimony that he provided Seacoast with tax documents is sufficient to create an issue of material fact in this regard.